[No. S029460. July 25, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDALL SCOTT CASH, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted Randall Scott Cash of the first degree murder of Bud Smith (Pen. Code, § 187),[1] and it found true a special circumstance that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(A)). The jury also convicted defendant of the attempted murder of Susan Balestri (§§ 664/187). With respect to both the murder and the attempted murder, the jury found that defendant personally used a firearm (§ 12022.5). It also found that in committing the attempted murder, defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)), and personally inflicted great bodily injury (§ 12022.7). At the penalty phase the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).)

We affirm the judgment as to guilt and the robbery special circumstance, but, because of prejudicial error in death qualification of the jury we reverse the judgment as to the penalty of death.

## I. FACTS

### A. Guilt Phase—Prosecution's Case

In June 1985, defendant sublet a room in a house occupied by Bud Smith, a cocaine dealer, and by Susan Balestri, Smith's girlfriend. Over the course

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

of the summer, defendant began to exhibit mood changes, lost a job he had held for four years, and experienced financial difficulties.

Todd Babbitt, a friend of defendant's, testified that in mid-September 1985, defendant jokingly said to him, "I ought to just tie [Smith] up and take [Smith and Balestri's] money and his dope." Defendant told Babbitt that Smith kept $3,000 to $4,000 in cash in his bedroom.

By October 1985, defendant's car had been repossessed, and he owed $330 in back rent to Smith, who set a payment deadline of Monday, October 28. At a party on the evening of October 26, defendant asked David Rogers to get drugs for him from Smith. When Rogers returned empty-handed, defendant remarked he wished he knew a coke dealer to "knock off" for money or drugs.

Later that evening, defendant and three friends were at the Smith house. They sat in the living room watching television, drinking alcohol, and using "speed." Meanwhile, Smith and Balestri were in their bedroom. Sometime after 4:00 a.m., Balestri walked through the living room, where she found defendant and one friend asleep on separate couches. She returned to the bedroom and locked the door.

Around 9:30 the next morning, Balestri was still in bed when the bedroom door burst open and defendant, armed with a rifle, started shooting at Smith's back. When Balestri screamed, defendant told her: "Shut up. If you don't do what I say, I'm going to kill you too. I have to. I have to." When Balestri covered her face, defendant shot her, injuring her finger. He then grabbed her by the hair, dragged her into the living room, and shot her in the chest. Grabbing a wooden baton from the coat rack, defendant beat Balestri on the head until the baton broke.

Defendant dragged Balestri back into the bedroom, tied her legs together, and repeatedly pounded her head with his rifle. Using a set of handcuffs belonging to Balestri, defendant handcuffed her right wrist to her left ankle and gagged her. She could hear defendant opening drawers and rummaging through the closets and the jingling of keys attached to Smith's wallet. She also heard the sound of a razor blade chopping on a mirror, followed by a sniffing sound, leading her to believe defendant was snorting cocaine.

While Balestri was on the floor, defendant kicked her in the stomach and asked where the money was kept. She told him it was on a clipboard kept underneath the nightstand. She heard him go to that part of the room. When she next saw him, defendant was holding a thick wad of bills. Before leaving

the bedroom, defendant tied Balestri up more tightly, lashing her to the bed and to Smith's body. Defendant fired two more shots at Balestri and left the bedroom. Shortly thereafter, defendant returned, pulled apart Balestri's thighs, and looked at her genitals.

Balestri eventually freed herself and summoned help from the neighbors, who called the police. The responding officers found a note on the front door of Smith's house. It said: "Do not disturb till 6:00 o'clock."

On October 29, 1985, the police arrested defendant at a Fresno motel. In the room he had occupied, they found a rucksack containing a hunting knife, a pistol, and a brown box containing $700 and several bindles of cocaine bearing Smith's distinctive label.

Smith died from multiple gunshot wounds, three of which had been fired at close range. Although Balestri sustained lacerations on her head and four gunshot wounds, she survived and testified as a prosecution witness.

### B. *Guilt Phase—Defense Case*

Defendant did not testify.

William Bratten testified that on the day of the shooting he had spoken to his friend Todd Babbitt, but Babbitt never mentioned an earlier conversation with defendant during which defendant spoke of harming or stealing from Smith, the murder victim.

A defense investigator testified that when he tried to interview David Rogers, the latter refused to cooperate, saying that he had no interest in helping defendant, and that his only interest would be to "bury" defendant.

Three witnesses testified about events shortly before the shooting.

Defendant's employer characterized defendant as his "right-hand man" until a month or six weeks before defendant failed to return from vacation in late August 1985. In those weeks preceding his vacation, defendant had become belligerent and had begun wearing a hunting knife.

A friend of Smith's testified that he overheard Smith tell defendant to move out because he had not paid his rent. Defendant was distraught and asked for more time, but Smith gave him a one-week deadline.

Patrick Malone, a former resident of the house, testified that Smith had exchanged cocaine for the use of defendant's truck and that defendant had given Smith all his vacation pay, some $700 to $800, to pay for drugs.

## C. *Penalty Phase—Prosecution Case*

The prosecution presented evidence of two prior murders: in January 1977, when he was 17 years old, defendant had killed his elderly grandparents, Daniel and Verneva Kent. Their bodies were found in easy chairs in the living room of their home in the State of Kansas. Each had been shot in the head. The house was in disarray, with pills scattered about and a woman's purse lying open on the floor.

Mark Nelson, a friend of defendant's, was present when defendant argued with and shot the Kents. Defendant and Nelson were arrested early the next morning while driving the Kents' car. In the car, the officers found a stereo and two shotguns.

Defendant was tried as a juvenile in Kansas. He admitted killing his grandparents and, in August 1977, was committed for treatment to a state facility. After successfully completing probation, defendant was released in January 1979.

## D. *Penalty Phase—Defense Case*

The defense presented many witnesses who testified to the circumstances of defendant's early life. His parents' marriage broke up when he was 14 months old. His mother left defendant and his sister with her parents, the Kents. Defendant was sickly as a child, suffering from asthma and extreme nearsightedness. Defendant stayed with the Kents until his freshman year in high school, when he moved in with his mother and her third husband.

In the fall of his sophomore year in high school, defendant returned to his grandparents' home. Daniel Kent had been diagnosed with prostate cancer, and Verneva Kent needed defendant to drive her to medical appointments. Verneva Kent suffered from a variety of ailments that confined her to a wheelchair.

In 1979, after his release from the juvenile treatment facility in Kansas, defendant came to Southern California, where he lived with his mother. In 1981, defendant and his mother moved to Fremont in Northern California. Defendant found work in a printshop, where he was considered a steady, dependable worker during most of the four years of his employment.

Defendant testified on his own behalf. In the summer of 1985, he sublet a room from Smith, a cocaine dealer. Smith often gave defendant cocaine in payment for errands. When defendant lost his job and his car was repossessed, he began trading his personal possessions to Smith in exchange for

drugs. By mid-October, defendant's daily consumption of alcohol and drugs included two to three 6-packs of beer, a pint of hard liquor, marijuana, and up to half a gram of cocaine or methamphetamine.

On the morning of October 27, 1985, Smith got up about 8:00 a.m. and defendant obtained some cocaine from him. Smith again threatened to beat up defendant if he did not pay his debts. Shortly after that conversation, defendant took the loaded rifle kept by the front door, went into the bedroom, and shot Smith. He left the house after tying Balestri to Smith's body. Realizing he had no money, he returned, ungagged Balestri, and asked her where Smith kept his cash.

Two psychiatrists, Dr. Herbert Modlin and Dr. William Vicary, testified on defendant's behalf. Dr. Modlin, of the Menninger Clinic, was appointed by the Kansas court in 1977 to examine defendant in connection with the murders of defendant's grandparents. He diagnosed defendant at that time as having depressive neurosis. Dr. Modlin did not consider defendant a sociopath. In his opinion the combination of drugs and alcohol defendant consumed on the day he murdered his grandparents reduced defendant's already weak ability to control his emotions. In 1977, Dr. Modlin had recommended that defendant receive psychiatric treatment, but he never did. In Dr. Modlin's view psychiatric treatment could have prevented defendant's violent assaults on Smith and Balestri in 1985.

Dr. William Vicary evaluated defendant in connection with the present offenses. In his opinion, defendant has since childhood suffered from severe depression caused by rejection by his parents, an older sister's death from drug abuse, and his upbringing by grandparents with rigid personalities and poor health. Defendant was feeling trapped and depressed at the time of the Kansas killings and again when he attacked Smith and Balestri. In each case, defendant had expressed remorse and accepted responsibility for the crimes.

## II. JURY SELECTION ISSUES

### A. *Denial of Voir Dire on Prior Murders*

The trial court conducted death qualification voir dire of each prospective juror individually and out of the presence of other prospective jurors (see *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]), followed immediately by general voir dire of that juror. Voir dire of each prospective juror proceeded in three steps: The court asked death-qualifying questions, attorneys for each side posed death-qualifying questions, and finally each side posed questions on general voir dire. After each

step, the court entertained challenges for cause. All prospective jurors not excused for cause during this process were directed to return at a later date. When the prospective jurors remaining after voir dire assembled on that date, they were called into the jury box according to randomly assigned numbers, the court entertained the parties' peremptory challenges, and in this manner the final selection of the jury and the alternates was concluded.

On the second day of voir dire, when defense counsel attempted to ask a prospective juror whether there were "any particular crimes" or "any facts" that would cause that juror "automatically to vote for the death penalty," the trial court ruled the questions improper because "we're restricted to this case." Later, when no prospective juror was present, defense counsel asked the court to reconsider the restriction. Counsel explained that the defense wanted to determine whether prospective jurors could return a verdict of life without parole for a defendant who had killed more than one person, without revealing that defendant had killed his grandparents. The trial court replied that because the prior murders were not expressly alleged in the charging document, it would not permit any such questions: "You cannot ask anything about the facts that are not charged in the Information, period. You can't raise one mitigating factor, nor can [the prosecutor] raise one aggravating [factor] that is not charged in the Information. . . . You cannot go past the Information."

The defense then prepared and filed a written motion seeking permission to ask prospective jurors "whether there are any aggravating circumstances which would cause a prospective juror to automatically vote for the death penalty, without considering the alternative of life imprisonment without possibility of parole." The trial court denied the motion with this comment: "I am not permitting you to ask them about any specific acts of mitigation or aggravation, as that would in my opinion have them prejudge the evidence." The trial court enforced this ruling during the remainder of the voir dire, prohibiting any defense questioning about uncharged facts or circumstances that would cause a prospective juror to vote automatically for the death penalty.

■ Defendant contends that by preventing all voir dire on the issue of prior murders, the court denied him his rights under our federal and state Constitutions to an impartial penalty jury. We agree.

■ Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) "The real question is ' " 'whether the

juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*' " ' " (*People v. Ochoa* (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78], quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1318 [65 Cal.Rptr.2d 145, 939 P.2d 259], quoting in turn *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984].) Because the qualification standard operates in the same manner whether a prospective juror's views are for or against the death penalty (*Morgan v. Illinois* (1992) 504 U.S. 719, 726-728 [112 S.Ct. 2222, 2228-2229, 119 L.Ed.2d 492]), it is equally true that the "real question" is whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of life without parole in the case before the juror.

■ A challenge for cause may be based on the juror's response when informed of facts or circumstances likely to be present in the case being tried. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].) In *Kirkpatrick,* the defendant was charged with the execution-style killings of a teenage employee and a former supervisor against whom he bore a grudge. (*Id.* at pp. 999-1000.) The prosecution's case in aggravation included two uncharged assaults by the defendant on teenage boys, and an incident in which the defendant had threatened to harm the daughter and the pet dogs of a woman with whom he had a dispute over a calculator. (*Id.* at pp. 1001-1002.) The trial court permitted the defendant to ask jurors if they would automatically vote for or against death "in cases involving any generalized facts, *whether pleaded or not,* that were likely to be shown by the evidence" (*id.* at p. 1004, italics added). But the court ruled that the parties could use this voir dire only as a basis for peremptory challenges, not to establish grounds to challenge a prospective juror for cause.

We concluded the trial court erred by not permitting such questions to support a challenge for cause. We held: "A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause, *whether or not the circumstance that would be determinative for that juror has been alleged in the charging document.*" (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1005, italics added; accord, *People v. Ervin* (2000) 22 Cal.4th 48, 70 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Thus, we affirmed the principle that either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial

evidence, that would cause them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence. (See CALJIC No. 8.85 (2000 rev.) (6th ed. 1996).)

We have endorsed such particularized death-qualifying voir dire in a variety of situations. A prosecutor may properly inquire whether a prospective juror could impose the death penalty on a defendant in a felony-murder case (*People v. Pinholster* (1992) 1 Cal.4th 865, 916-917 [4 Cal.Rptr.2d 765, 824 P.2d 571]), on a defendant who did not personally kill the victim (*People v. Ochoa, supra,* 26 Cal.4th at p. 431; *People v. Ervin, supra,* 22 Cal.4th at pp. 70-71), on a young defendant or one who lacked a prior murder conviction (*People v. Livaditis* (1992) 2 Cal.4th 759, 772-773 [9 Cal.Rptr.2d 72, 831 P.2d 297]), or only in particularly extreme cases unlike the case being tried (*People v. Bradford, supra,* 15 Cal.4th at p. 1320).

■ Here, the trial court's ruling prohibited defendant's trial attorney from inquiring during voir dire whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. Because in this case defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was present in the case and that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances, the defense should have been permitted to probe the prospective jurors' attitudes as to that fact or circumstance. In prohibiting voir dire on prior murder, a fact likely to be of great significance to prospective jurors, the trial court erred. In fairness to the trial court, we note that most of our decisions clarifying the law on this point were announced after the trial in this case.

Arguing that the trial court did not err in restricting voir dire to facts and circumstances alleged in the information, the Attorney General relies on language in some of our prior decisions to the effect that death-qualification voir dire " 'seeks to determine only the views of the prospective jurors about capital punishment in the abstract' " and " ' "without regard to the evidence produced at trial." ' " (*People v. Medina* (1995) 11 Cal.4th 694, 746 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Clark* (1990) 50 Cal.3d 583, 596-597 [268 Cal.Rptr. 399, 789 P.2d 127].) ■ Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be

presented. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 990-991 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [not error to refuse to allow counsel to ask juror given "detailed account of the facts" in the case if she "would impose" death penalty].) In deciding where to strike the balance in a particular case, trial courts have considerable discretion. (*People v. Champion* (1995) 9 Cal.4th 879, 908 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People v. Pinholster, supra,* 1 Cal.4th at p. 918.) They may not, however, as the trial court did here, strike the balance by precluding mention of any general fact or circumstance not expressly pleaded in the information. (*People v. Ervin, supra,* 22 Cal.4th at p. 70; *People v. Earp, supra,* 20 Cal.4th at p. 853; *People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1005; see also *People v. Livaditis, supra,* 2 Cal.4th at pp. 772-773.)

In *Medina,* on which the Attorney General particularly relies, the trial court initially declined to permit voir dire on whether prospective jurors could vote for life imprisonment if the defendant had committed multiple murders, but later the trial court changed its ruling and allowed such questioning. Despite dictum expressing doubt that the court's initial ruling was incorrect, we held that the initial ruling did not prejudice the defendant because "after the trial court clarified its position with respect to the multiple murder question, defendant failed to ask to reexamine any juror on this topic." (*People v. Medina, supra,* 11 Cal.4th at p. 746.) Here, by contrast, the trial court never altered its erroneous ruling, and defendant had no opportunity to reexamine any juror with respect to the prior murder question.

■ Error in restricting death-qualification voir dire does not invariably require reversal of a judgment of death. (*People v. Cunningham* (2001) 25 Cal.4th 926, 974 [108 Cal.Rptr.2d 291, 25 P.3d 519].) In particular, we have suggested that such error may be deemed harmless if the defense was permitted "to use the general voir dire to explore further the prospective jurors' responses to the facts and circumstances of the case" or if the record otherwise establishes that none of the jurors had a view about the circumstances of the case that would disqualify that juror. (*Ibid.*) Here, however, the general voir dire of each prospective juror immediately followed the death-qualification voir dire, and it seems clear from the record that the trial court's ruling extended to both portions of the voir dire. The Attorney General does not contend otherwise. As a result, defendant was unable to use the general voir dire to cure the prejudice resulting from the trial court's erroneous limitation on the scope of voir dire.

A defendant who establishes that "any juror who eventually served was biased against him" is entitled to reversal. (*People v. Cunningham, supra,* 25 Cal.4th at p. 975; *People v. Avena* (1996) 13 Cal.4th 394, 413 [53

Cal.Rptr.2d 301, 916 P.2d 1000].) Here, defendant cannot identify a particular biased juror, but that is because he was denied an adequate voir dire about prior murder, a possibly determinative fact for a juror. By absolutely barring any voir dire beyond facts alleged on the face of the charging document, the trial court created a risk that a juror who would automatically vote to impose the death penalty on a defendant who had previously committed murder was empanelled and acted on those views, thereby violating defendant's due process right to an impartial jury. (See *Morgan v. Illinois, supra,* 504 U.S. at p. 739 [112 S.Ct. at p. 2235].) The trial court's restriction of voir dire "leads us to doubt" that defendant "was sentenced to death by a jury empanelled in compliance with the Fourteenth Amendment." (*Ibid.*)

Because the trial court's error makes it impossible for us to determine from the record whether any of the individuals who were ultimately seated as jurors held the disqualifying view that the death penalty should be imposed invariably and automatically on any defendant who had committed one or more murders other than the murder charged in this case, it cannot be dismissed as harmless. Thus, we must reverse defendant's judgment of death. (*Morgan v. Illinois, supra,* 504 U.S. at p. 739 [112 S.Ct. at p. 2235].)

B. *Peremptory Challenge Based on Religious Training*

During jury selection, the defense accused the prosecution of exercising its peremptory challenges to excuse seven of eight prospective African-American jurors because of their race, in violation of the federal and state Constitutions. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [106 S.Ct. 1712, 1716-1719, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748].)

By asking the prosecutor to explain her peremptory challenges, the trial court here implicitly found that defendant had made a prima facie showing of racial bias. The prosecutor then gave reasons for the challenges. The trial court found the reasons to be neutral and persuasive and concluded there had been no exclusion based on race.

On appeal, defendant does not challenge the trial court's ruling as to the prosecution's exclusion of six of the seven African-American prospective jurors challenged by the prosecution. Defendant challenges the ruling only as to the seventh African-American prospective juror, Eric S., claiming that the prosecutor's primary ground for challenging Eric S. was that he had been raised a Jehovah's Witness.

The prosecutor, believing that Jehovah's Witnesses are "taught not to pass judgment," was concerned that Eric S.'s early religious training would

render him unwilling to vote for death. In addition, the prosecutor said she had challenged Eric S. because he gave abrupt answers suggesting he resented being questioned. For example, when defense counsel asked him to explain his jury questionnaire statement that he considered the death penalty appropriate for certain crimes, Eric S. replied, "I feel that it's fairly clear." Thereafter, when the prosecutor asked if Eric S. could look defendant in the eye and vote for death, Eric S. replied, "Sure." The prosecutor asked again, and Eric S. replied, "I said yes."

Without giving a specific reason, the prosecutor expressed doubt that Eric S. "would get along with the other jurors." The prosecutor's final objection to Eric S. was that he seemed reluctant to serve as a juror. "He was sitting on the edge of his seat . . . holding his backpack ready to get out of here."

The vice that *Wheeler* seeks to address is the exclusion of any juror based on the "presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Wheeler, supra,* 22 Cal.3d at p. 276.) Although this court has described the protections against group exclusion as including religious affiliation, the United States Supreme Court has only applied *Batson* to forbid group exclusion based on race or gender. (*J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127 [114 S.Ct. 1419, 128 L.Ed.2d 89]; see *Davis v. Minnesota* (1994) 511 U.S. 1115 [114 S.Ct. 2120, 128 L.Ed.2d 679] (dis. opn. of Thomas, J.) [peremptory challenge to African-American juror because juror was a Jehovah's Witness].)

The United States Supreme Court has set out a three-step process that is required when a party claims that an opponent has improperly discriminated in the exercise of peremptory challenges. The first step is for the complaining party to make out a prima facie case of racial discrimination. If the complaining party does so, in step two the burden of production shifts to the opponent to advance a race-neutral explanation. If a race-neutral reason is tendered, in step three the court decides whether the complaining party has proved purposeful racial discrimination. (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834]; *People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

The reasons advanced by the challenging party at step two need not be tactically sound or even plausible; absent a discriminatory intent inherent in the proffered reasons, those reasons will be deemed race neutral. (*Purkett v. Elem, supra,* 514 U.S. at p. 768 [115 S.Ct. at p. 1771].) Only at step three is the persuasiveness of the reasons relevant. "At that stage implausible or

fantastic justifications may . . . be found to be pretexts for purposeful discrimination." (*Ibid.*)

██ Here, at step one, the trial court implicitly found the defense made a prima facie case of racial discrimination. (*People v. Ervin, supra,* 22 Cal.4th at p. 75.) We assume substantial evidence supports that determination. (*People v. Silva, supra,* 25 Cal.4th at p. 384.)

The prosecutor then came forward (step two) with various reasons for excusing Eric S. that did not reveal any racial intent. The prosecutor objected to Eric S. because of his possible reluctance to vote for death, his attitude toward the court and counsel, his possible inability to get along with other jurors, and his seeming reluctance to serve. The court properly deemed these reasons to be race neutral. (*Purkett v. Elem, supra,* 514 U.S. at p. 768 [115 S.Ct. at p. 1771].)

Defendant challenges only the third step in the process—namely, whether the prosecutor's reasons were persuasive and not merely a pretext for discrimination. The defense did not object below that the prosecutor challenged Eric S. *because* Eric S. was raised as a Jehovah's Witness. Defense counsel argued to the trial court, in essence, that the prosecutor's religious justification was merely a pretext for race-based exclusion. (See *J.E.B. v. Alabama ex rel. T.B., supra,* 511 U.S. at p. 145 [114 S.Ct. at p. 1430] [peremptory challenge must be based on a juror characteristic other than race or gender and proffered explanation may not be pretextual].)

Excusing prospective jurors who have a religious bent or bias that would make it difficult for them to impose the death penalty is a proper, nondiscriminatory ground for a peremptory challenge. (*People v. Ervin, supra,* 22 Cal.4th at p. 76; see *People v. Catlin* (2001) 26 Cal.4th 81, 118-119 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Here, the prosecutor indicated her concern that Eric S. might harbor an antideath bias based on his early religious training. (See *U.S. v. Stafford* (7th Cir. 1998) 136 F.3d 1109, 1114.) The trial court found that concern to be a "valid position." Religion was not, however, the only reason the prosecutor gave. Eric S.'s attitude was also a concern. The transcript before us does not reveal Eric S.'s tone or body language. In that respect the trial court was far more able than we are to evaluate whether Eric S. was, as the prosecutor described him, "smart alecky" and anxious to get out of the courtroom.

When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its conclusion. (*People v. Fuentes* (1991) 54 Cal.3d 707, 720

[286 Cal.Rptr. 792, 818 P.2d 75]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1197-1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Here, the trial court rejected defendant's claim of pretext. The prosecutor's reasons for excusing Eric S. are not inherently implausible and find support in the record. Thus, the trial court did not err in denying defendant's *Wheeler/Batson* motion claiming prospective juror Eric S. was excluded because of his race.

## III. Guilt Phase Issues

### A. *Evidentiary Rulings*

#### 1. *Exclusion of evidence of victim's violence*

At trial the defense sought to portray murder victim Bud Smith as a violent, manipulative man who had threatened defendant with physical violence if he did not pay Smith his drug debts and overdue rent. The defense sought to introduce evidence of Smith's past violent reprisals for unpaid debts to establish provocation sufficient to reduce defendant's killing of Smith to second degree murder, and to bolster the defense that defendant formed an intent to rob only after he completed his attacks on Smith and Balestri, and thus did not kill Smith in the course of a robbery.

Consistent with this theory, defense counsel in opening statement told the jury the defense would elicit testimony from two witnesses that Smith had forcibly evicted former housemate Pat Malone for not paying rent, and that Balestri and defendant were present when Smith had done so. On cross-examination, Balestri testified that Smith had evicted Malone "with force." The trial court overruled the prosecutor's objection that the "character of the deceased is not relevant." Defense counsel then asked Balestri if she remembered Billy Mackey and a dispute between Mackey and Smith over money Mackey owed Smith. After the trial court sustained the prosecutor's relevance objection, defense counsel asked Balestri: "It's true, isn't it, that when people owed Bud money and they didn't pay physical violence often occurred." The trial court sustained the prosecutor's relevance objection.

■ Defendant argues that this last ruling was erroneous because the evidence he sought to elicit was *not* character evidence of Smith's prior bad acts (Evid. Code, § 1103, subd. (a)), but was evidence of Smith's conduct that was part of the events surrounding the crime. The claim is unpersuasive. Smith's customary debt collection practices were not relevant to show defendant's state of mind at the time he killed Smith unless defendant knew of those practices. Defendant did present evidence of Smith's violence directed at Malone in defendant's presence. There was no evidence, however, that defendant knew of violent acts by Smith against Mackey.

Defendant contends the trial court should not have sustained the prosecutor's relevance objection when defense counsel asked Pat Malone about "the circumstances in which [he] left the [Smith] house." We disagree. Balestri had already testified that Smith had forcibly evicted Malone. The trial court could reasonably have found that the broadly framed question might get an answer going well beyond Smith's violent behavior. Only relevant evidence is admissible, and the trial court has broad discretion to determine the relevance of evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

Defense counsel asked Paul Jorgensen, who visited Smith daily in the fall of 1985, if he had heard Smith make threats about what Smith would do if defendant tried to leave the house without paying his debts. The trial court sustained the prosecutor's hearsay objection. Defense counsel responded, "I'm offering it for the purpose of state of mind." An out-of-court statement is admissible as an exception to the hearsay rule when offered to prove the declarant's state of mind, provided the declarant's state of mind is at issue. (Evid. Code, § 1250, subd. (a)(1).)

Whether or not the statement was hearsay, any threat Smith may have made was irrelevant. Smith's state of mind was not at issue, nor was it relevant to show his conduct in conformity with that state of mind, because he was asleep when he was shot. (Evid. Code, § 1250, subd. (a)(2); *People v. Ireland* (1969) 70 Cal.2d 522, 530-531 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) Thus the court did not err in sustaining the prosecutor's objection.

Defendant contends these isolated rulings had the effect of preventing him from establishing a pattern of provocation created by Smith's threats. We disagree. ■ The United States Constitution guarantees criminal defendants a meaningful opportunity to present a defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636].) Evidence that falls short of exonerating a defendant may still be critical to a defense. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 809 [268 Cal.Rptr. 753, 789 P.2d 934].) ■ Here the trial court's rulings did not prevent defendant from presenting evidence from which the jury might have concluded defendant's killing of Smith was the result of provocation. Defendant introduced evidence that Smith was adamant about being repaid and, in defendant's presence, had forcibly evicted Malone for nonpayment of rent. In closing argument, defense counsel emphasized defendant's increasingly desperate plight as his debt to Smith grew day by day, and characterized defendant's attack as an outburst of rage rather than an act of premeditated murder or murder for the purpose of robbery. In these circumstances we

cannot conclude that the trial court's rulings prevented defendant from presenting those defenses.

### 2. Limitation on impeachment of Balestri

At the preliminary hearing, Balestri testified that after defendant tied her up in the bedroom she heard, but could not see, him go to a desk on the other side of the room in which Smith kept cocaine. Balestri then heard sounds of the cocaine being cut and of sniffing. Shortly thereafter defendant kicked Balestri in the stomach and demanded to know where the money was kept. She told him it was "on a clipboard on a night table." She then testified that she did not see defendant take either the cocaine or the money. At trial, Balestri testified that she saw defendant remove a wad of bills from the clipboard.

When defense counsel sought to impeach Balestri with this apparent inconsistency, the trial court asked her whether she had seen defendant "take it [the clipboard with the money]" from the nightstand, and she said no. But she testified she saw defendant in possession of the roll of bills from the clipboard. When defense counsel tried to get Balestri to identify where in her preliminary hearing testimony she described defendant removing money from the clipboard, the court sustained the prosecution's objection that there was no inconsistency. The trial court characterized the question as "improper," explaining that Balestri had not been asked at the preliminary hearing if she saw defendant holding the money, only if she saw defendant take the money from the nightstand.

 Defendant contends this was an inconsistency that "would probably have tipped the scale to a finding of untrue for the [robbery-murder] special circumstance." Moreover, he argues that the trial court committed misconduct both by suggesting defense counsel was asking an improper question and by then stating there was no inconsistency. We disagree.

Even assuming the trial court's evidentiary ruling was erroneous, defendant was not prejudiced. Whether or not Balestri actually saw defendant with Smith's money, there was no inconsistency between her preliminary hearing testimony and her trial testimony that after she heard sounds consistent with cocaine use, defendant kicked her in the stomach and asked where the money was. Moreover, these events occurred *after* Smith was dead and *after* defendant had shot and beaten Balestri. Thus there is not a reasonable probability that the trial court's ruling affected the jury's decision that defendant had formed the intent to rob before or at the time he shot Smith.

### 3. Admission of evidence that Balestri was pregnant

Defendant had moved in limine to exclude all mention of Balestri's pregnancy, on the ground it was more prejudicial than probative, but the trial

court reserved any ruling until the matter came up in trial. At trial, when the prosecutor asked Balestri if she was pregnant at the time of the attack, the defense objected that the question was not relevant, but the trial court overruled the objection. Balestri testified that she had been pregnant, though at the time she had merely suspected the pregnancy because it was only four weeks advanced. No further evidence pertaining to her pregnancy or its outcome was introduced.

Defendant contends that the trial court erred by overruling the relevance objection and that the error requires reversal. In his view the evidence was so inflammatory that its erroneous admission denied defendant due process under *Bruton v. United States* (1968) 391 U.S. 123, 131, footnote 6 [88 S.Ct. 1620, 1625, 20 L.Ed.2d 476], and violated the reliability standards imposed by the Eighth Amendment. (*Beck v. Alabama* (1980) 447 U.S. 625, 638 [100 S.Ct. 2382, 2390, 65 L.Ed.2d 392].)

Relevant evidence includes evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) As the Attorney General concedes, Balestri's pregnancy was clearly irrelevant to any issue in the case. Thus, the trial court erred in admitting the evidence.

The impact of this evidence, however, pales in light of the other acts of violence defendant committed against Balestri. Before defendant kicked her in the stomach he shot at her twice, beat her repeatedly about the head with the butt of his rifle and then with a wooden rod until it broke, dragged her by her hair, and gagged and bound her. It strains credulity to infer that any jury, knowing that the victim had suffered such abuse, would be swayed to convict by learning that the victim was four weeks pregnant.

Accordingly, the error was harmless under the state standard of error set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Even assuming that the error implicated defendant's rights under the federal Constitution, the error was harmless under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 23-24 [87 S.Ct. 824, 827-828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].

B. *Comments on Todd Babbitt's Bench Warrant*

Todd Babbitt, a friend of defendant's, testified at trial as a prosecution witness. He stated that one day in mid-September, alluding to the $3,000 to $4,000 in cash that Smith and Balestri kept in their room, defendant "jokingly" said: "I ought to just tie him [Smith] up and take their money and his

dope." Babbitt mentioned this remark to the police some hours after they told him about the attack on Smith and Balestri.

Seeking to defuse a defense attack on Babbitt's motivation for testifying, the prosecutor brought out on direct examination that in 1990 Babbitt had pled guilty to driving under the influence, that the case was still pending, and that he had an outstanding bench warrant for failure to appear. When Babbitt explained that he "just couldn't make it to court because [he] was up in Washington," the trial court commented: "You're going to make a misdemeanor a federal offense if you don't take care of it." When Babbitt admitted that he had a fine of $1,200 outstanding, the court interjected: "That's right. You don't pay, you go to jail." The defense did not object to the court's comments.

Defendant now contends that the trial court's comments were "gratuitous and inappropriate because they conveyed an argument favorable to the prosecution," and that the court's comment undercut defendant's effort to impeach Babbitt. Defendant contends the error requires reversal because Babbitt's testimony was crucial to the prosecution's theory that defendant committed his attacks on Smith and Balestri to facilitate his planned robbery of them.

We determine the propriety of judicial comment on a case-by-case basis in light of its content and the circumstances in which it occurs. (*People v. Sanders* (1995) 11 Cal.4th 475, 531-532 [46 Cal.Rptr.2d 751, 905 P.2d 420].) To preserve the issue for review, a defendant must make a timely objection. (*Id.* at p. 531.) Defendant here did not object at trial, but he contends that any objection would have been futile or an admonition ineffective to cure the error. (*People v. Arias* (1996) 13 Cal.4th 92, 159 [51 Cal.Rptr.2d 770, 913 P.2d 980].) He argues that an objection to the court's facetious "federal case" comment would have been counterproductive because the court might have ridiculed the defense for objecting, or, if the court agreed to admonish the jury, an admonition might have made the defense appear foolish in suggesting that a relatively trivial benefit to Babbitt would tempt him to fabricate or exaggerate such damning evidence.

Defendant characterizes the trial court's tone as one of "good-natured" admonishment and "mock judicial severity." Whatever that tone may have been, the court simply advised Babbitt to resolve the matter of the outstanding warrant and to pay the $1,200 fine or face time in jail. Neither comment was improper. Assuming, however, that the court's tone deprecated the seriousness of Babbitt's motive to exaggerate or fabricate, an admonition would have cured any error. Defendant sought no such curative admonition, and therefore he has forfeited any claim of error.

Defendant further argues that had the trial court not demeaned defense counsel's efforts to impeach Babbitt, the jury would likely have disbelieved Babbitt's testimony about defendant's plan to rob Smith. Not so. It was undisputed that during the afternoon interview with police, when Babbitt learned of Smith's murder, Babbitt did not mention defendant's earlier statement about tying up Smith. Babbitt did, however, call the police to report that remark some three hours later. It was also undisputed that Babbitt's outstanding warrant stemmed from an offense committed some five years *after* the murder. Accordingly, whatever motive Babbitt may have had at the time of trial to testify in a manner favorable to the prosecution, his testimony at trial was apparently consistent with his statement at the time of the murder. In these circumstances, the trial court's comments cannot have been prejudicial to defendant under any test.

### C. *Prosecutorial Misconduct in Closing Argument*

David Rogers testified for the prosecution that on the night before the murder he had tried unsuccessfully to obtain cocaine for defendant from Smith. When Rogers returned empty-handed, defendant said he wished he knew a coke dealer he could "knock off" for money or drugs, and he asked if Rogers might know of a victim. Rogers did not report the conversation to the police until shortly before trial.

Defense investigator Randy Schmidt approached Rogers before trial, but Rogers refused to talk to him. Schmidt testified he had learned about Rogers from Rogers's sister and sought to find out what Rogers could "add to the case," though Schmidt "had no information as to what" Rogers would tell him. To Schmidt, Rogers expressed no interest in helping defendant, only in "burying" him.

In closing argument the prosecutor told the jury that Rogers had no motive to fabricate. She noted that no leniency had been shown Rogers and then stated: "They brought in Randy Schmidt, their investigator . . . to try to say that [Rogers] was going to bury [defendant] and that's why he came forward . . . . [¶] Well, why not tell a good lie, and why not do it right away? That's what we're here for. [¶] Now, what's interesting about Mr. Rogers is the defense, how did they know he existed? How did they know he had something to say? [¶] They talked with him in February before I even knew he existed. . . . I didn't even know who he was until mid May. [¶] Only one person I can think of that would know that there was an important conversation with him—" At this juncture the defense objected to the argument as improper. The court told the jury, "[A]s I indicated to you, the statements of the attorneys are not evidence." The prosecutor did not resume this line of argument.

■ Defendant contends the prosecutor's comment implied, without any basis in the evidence, that defendant was the *only* person who knew of his conversation with Rogers the night before the attack, and that either investigator Schmidt was lying when he said he had no idea what information Rogers might have or that defense counsel had withheld information from investigator Schmidt. Defendant claims the argument was prosecutorial misconduct that was not cured by the court's admonition that argument is not evidence, violating his Sixth Amendment right to effective counsel.

■ It is misconduct for the prosecutor in argument to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense. (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 59 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Counsel may not state or assume facts in argument that are not in evidence. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 102 [270 Cal.Rptr. 817, 793 P.2d 23].) That said, we accord counsel great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence. (*People v. Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Such latitude precludes opposing counsel from complaining on appeal that the opponent's " 'reasoning is faulty or the conclusions are illogical.' " (*Ibid.*)

■ Here, the prosecutor was inferring that defendant was the most likely person on the defense side to know he had talked to Rogers the evening before the attacks. That inference was not necessarily inconsistent with Schmidt's testimony that Rogers's sister had suggested the investigator talk to Rogers because Rogers knew Smith and might be able to say something about Smith's character. Nor was it inconsistent with investigator Schmidt's testimony that when he first contacted Rogers, Schmidt "had no information as to what [Rogers] could tell me."

The second claim, that the prosecutor was alleging defense dishonesty, is more complex. Defendant reasons thus: The prosecutor was assuming defendant both remembered the substance of his conversation with Rogers and recounted it sometime before February to either or both his attorney and the investigator. Therefore, the prosecutor was accusing investigator Schmidt of committing perjury when Schmidt testified he approached Rogers without knowing what Rogers could tell him. Defense counsel colluded in this "dishonesty" if counsel knew of the pre-attack conversation between defendant and Rogers, but failed to tell the investigator about the conversation. Alternatively, counsel conspired to elicit perjurious testimony from the investigator. This claim also fails.

■ When the prosecution denigrates defense counsel, there is a risk the jury will shift its attention from the evidence to the alleged defense

improprieties. (*People v. Bemore, supra,* 22 Cal.4th at p. 846; *People v. Frye* (1998) 18 Cal.4th 894, 977-978 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense . . . ." (*People v. Bemore, supra,* 22 Cal.4th at p. 846.) For defendant's claim to prevail on the merits we ask "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cunningham, supra,* 25 Cal.4th at p. 1001; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Prosecutorial comment is reversible as misconduct under the federal Constitution when it "'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144]; *People v. Frye, supra,* 18 Cal.4th at p. 969.) Under state law, however, prosecutorial comment that falls short of rendering the trial fundamentally unfair is misconduct when it involves "'"'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Here, it is implausible that the prosecutor's brief comment would have reasonably caused the jury to follow such a tenuous chain of inference to conclude that defense counsel had elicited perjury from investigator Schmidt.

Defendant contends the prosecutor's argument went beyond pointing out deficiencies in the defense effort to discredit Rogers as biased. We accord the prosecutor wide latitude in describing the factual deficiencies of the defense case. (*People v. Bemore, supra,* 22 Cal.4th at p. 846.) Here, the prosecutor argued that Rogers could have told a "good lie" and could have come forward much sooner had he falsified his account of the conversation with defendant. Rogers's testimony that he spoke to defendant on the night in question supported the prosecutor's inference that defendant as the other party to the conversation would have known that Rogers might be an important witness and conveyed that knowledge to his attorney. Moreover, the fact that the defense investigator approached Rogers long before the prosecutor was aware that Rogers knew something about the attack supported her inference that the defense knew Rogers could provide damning testimony.

The prosecutor's comment was brief, truncated by an objection, and not resumed. We conclude the prosecutor's statement amounted to proper comment on the evidence. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1057 [90

Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Ford* (1988) 45 Cal.3d 431, 449 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785].) Even if we were to assume there was some impropriety in the prosecutor's argument, it was cured when the trial court instructed the jury with the standard admonition that argument is not evidence.

### D. *Trial Counsel's Competence*

In closing argument, the prosecutor suggested to the jury that it begin its deliberations by focusing on robbery and looking at each element of that crime. Accordingly, she described the facts supporting a robbery from Smith's presence and against his will. " 'The taking was accomplished either by force, violence, fear or intimidation.' Now [Smith] is obviously dead, so he can't fear anything. The law covers that. The law . . . has another instruction . . . which I'll read to you. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery . . . can substitute [for] that fear if the victim's dead. Who is there? Susan Balestri. Was she in fear? Of course she was in fear."

■ Defendant contends the prosecutor's argument misstated the law because it told the jury that Balestri's fear would suffice to satisfy the force or fear element of a robbery of Smith. Defendant faults defense counsel for not objecting to the prosecutor's misstatement of the law and requesting an admonition.

■ To prevail on a claim of ineffective assistance, a defendant must show both that counsel's performance was deficient—it fell below an objective standard of reasonableness—and that defendant was thereby prejudiced. (*People v. Lucero* (2000) 23 Cal.4th 692, 728 [97 Cal.Rptr.2d 871, 3 P.3d 248].) Such prejudice exists only if the record shows that but for counsel's defective performance there is a reasonable probability the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].) To prevail on a claim of ineffective assistance on appeal " ' "the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." [Citation.]' " (*People v. Majors* (1998) 18 Cal.4th 385, 403 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)

■ Defendant is correct that the prosecutor misstated the law when she argued that *Balestri's fear* could satisfy the force or fear element of a robbery of *Smith*. ■ In order " '[t]o constitute robbery the property must be removed from the possession and immediate presence of the victim

. . . by force or fear.' " (*People v. Nguyen* (2000) 24 Cal.4th 756, 761 [102 Cal.Rptr.2d 548, 14 P.3d 221].) Logically, the fear experienced by one who is not a victim does not supply the force or fear element for robbery of another person.

Defense counsel did not object to the prosecutor's misstatement, and it is difficult to perceive a tactical purpose for not objecting. (*People v. Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Assuming, without deciding, that defense counsel rendered ineffective assistance by failing to object, we turn to whether defendant was prejudiced by that omission.

Despite the prosecutor's early misstatement, in the later portions of her argument and in summation she urged the jury to find the existence of a robbery-murder special circumstance because defendant formed an intent to rob before bursting into Smith and Balestri's bedroom. The prosecutor pointed to evidence that defendant armed himself, picked a time when Smith and Balestri were likely sleeping, and shot Smith first, all facts indicating that defendant entered the room with an intent to commit a robbery by first killing Smith to eliminate any resistance.

Defense counsel, likewise, argued to the jury that it must find a robbery of Smith, not of Balestri, in order to find the robbery-murder special circumstance. In doing so, he specifically told the jury that in order to find the robbery-murder special circumstance based on robbery of Smith it must find "that at the time that [defendant] applied the force when he shot Bud Smith, that is when he had already formed the intent to take property. . . . You must find for that special circumstance that for [defendant] Bud Smith's death was merely a means to an end."

Finally, the trial court instructed the jury for the robbery-murder special circumstance it "must find the murder was committed in order to carry out or to advance the commission of the crime of robbery . . . . The special circumstance referred to in my instruction is not established if the robbery was merely incidental to the commission of the murder. In other words, the special circumstance is not present if the defendant's intent is to kill and the related felony of robbery is merely incidental to the murder."

In light of this instruction, we reject defendant's contention the jury could have been misled into believing that it could find the robbery-murder special circumstance true, even if it found defendant only formed an intent to rob after he shot Smith. Under these instructions, and in light of the prosecutor's argument regarding the robbery-murder special circumstance, we conclude

that defense counsel's failure to object to the prosecutor's misstatement of the force or fear element of robbery cannot have prejudiced defendant.

### E. *Instructional Claims*

#### 1. *Pinpoint instruction on after-formed intent*

Defendant asked the trial court to give this pinpoint instruction: "If defendant did not conceive his intent to steal either before committing the act of force against Bud Smith, or during the commission of the act, then the taking cannot form the basis for the special circumstance allegation, or a finding of first degree felony murder." (See *People v. Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468].) This instruction was consistent with the defense theory that defendant only decided to steal Smith's cash after he killed Smith, because he then needed money to escape. The trial court refused to give the instruction, but it instructed the jury that "in the crime of robbery, there must exist in the mind of the robber *at the time the force is applied* the specific intent to commit such crime and to permanently deprive the owner of his property." (Italics added.) The trial court did not err by refusing to give defendant's special instruction, which redundantly instructed on when defendant must form an intent to rob.

Defendant also contends that the trial court's refusal to give his pinpoint instruction, when combined with the prosecutor's erroneous description of the force or fear element of robbery (see *ante*, at pp. 734-735), permitted the jury to ignore his defense of after-formed intent. We disagree. While the prosecutor's argument misstated the law, it was directed not to the issue of when defendant formed an intent to rob Smith, but instead to the force or fear element of that robbery.

#### 2. *Failure to instruct on theft*

Defendant contends the evidence would have supported, and therefore the trial court had a duty to give on its own initiative, an instruction on theft as a lesser included offense of the robbery that formed the basis for the charge of felony murder and the special circumstance allegation.

Defendants have a constitutional right to have the jury determine every material issue presented by the evidence, and a trial court's failure to instruct on lesser included offenses denies them that right. (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) "Although a trial court on its own initiative must instruct the jury on lesser included offenses of *charged* offenses, this duty does not extend to

*uncharged* offenses relevant only as predicate offenses under the felony-murder doctrine." (*People v. Silva, supra,* 25 Cal.4th at p. 371.) Defendant here was not charged with robbery, and the court therefore had no duty to instruct on theft as a lesser included offense of robbery.

Defendant contends the trial court must instruct on a lesser included offense of theft when, as here, the defendant is *not* charged independently with the greater offense (robbery) but that greater offense is the predicate offense for a special circumstance (murder in the commission of a robbery). He relies on three grounds, none of which is persuasive.

First, defendant relies on language in the special circumstance statute requiring the predicate crime to be "charged and proved pursuant to the general law applying to the trial and conviction of the crime." (§ 190.4, subd. (a), 2d par.) We have previously held that this language does not "require the substantive pleading or conviction of a special circumstance felony." (*People v. Morris* (1988) 46 Cal.3d 1, 16 [249 Cal.Rptr. 119, 756 P.2d 843].) We see no reason to revisit this issue.

Second, defendant argues the instruction should have been given as part of the trial court's duty to instruct on all applicable principles of law connected to the law and facts of the case. (*People v. Birks* (1998) 19 Cal.4th 108, 118 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) Defendant was not charged with robbery and therefore could not have been convicted of robbery or of theft as a necessarily lesser included offense of robbery. (*Ibid.; People v. Miller* (1994) 28 Cal.App.4th 522, 526 [33 Cal.Rptr.2d 663].)

Third, defendant analogizes to cases involving aiders and abettors. He argues, relying on *People v. Failla* (1966) 64 Cal.2d 560, 564 [51 Cal.Rptr. 103, 414 P.2d 39], that the trial court had a sua sponte duty to instruct on theft because it was an uncharged predicate offense for felony murder. In *Failla,* the court instructed the jury that the defendant committed burglary if he entered the residences intending to commit theft " 'or any felony.' " (*Id.* at pp. 563-564.) We held that the trial court should, on its own initiative, have instructed the jury as to what conduct constitutes a felony. No such ambiguity was involved here. The court instructed the jury on the elements of robbery, the only theory of felony murder advanced at trial and the felony supporting the special circumstance.

Defendant further contends the trial court's failure to instruct on theft violated his right to equal protection. He points out that a hypothetical defendant charged with robbery would be entitled to a lesser included offense instruction on theft. Defendant argues he is identically situated,

because neither he nor his hypothetical defendant could be punished both for the robbery-murder special circumstance and for the robbery. Defendant and his hypothetical counterpart are not similarly situated because defendant, unlike his hypothetical counterpart, could not be punished for robbery or for the lesser included offense of theft even if the jury had made a "not true" finding as to the robbery-murder special circumstance.

Finally, defendant contends the absence of a lesser included offense instruction violated his rights under the federal Constitution, namely his Sixth Amendment right to present a defense and his Eighth Amendment right not to be subject to cruel and unusual punishment. Defendant's claim does not fall within the limited situations in which such claims implicate rights under the federal Constitution. California requires a sua sponte instruction on lesser included *charged offenses* regardless of whether the case is a capital, or a noncapital, one. Therefore, the unavailability of a lesser included offense instruction to an *uncharged crime* does not operate to weight the outcome in favor of death for defendants facing capital charges. (*Hopkins v. Reeves* (1998) 524 U.S. 88, 96 [118 S.Ct. 1895, 1900, 141 L.Ed.2d 76]; *Beck v. Alabama, supra,* 447 U.S. at pp. 637-638 [100 S.Ct. at pp. 2389-2390]; *People v. Waidla* (2000) 22 Cal.4th 690, 736, fn. 15 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

### 3. *Instruction on motive*

■ The trial court instructed the jury: "Motive . . . is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt." (See CALJIC No. 2.51 (6th ed. 1996).) Defendant contends this instruction relieved the prosecution of its burden to prove beyond a reasonable doubt that he possessed the required intent to rob when he killed Smith. He advances this argument by assuming that the terms "motive" and "intent" are commonly understood as synonymous and by making the further assumption that the jury would have understood defendant's motive to be a need for cash.

As we have recently explained, motive is the "reason a person chooses to commit a crime," but it is not equivalent to the "mental state such as intent" required to commit the crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Defendant relies on *People v. Maurer* (1995) 32 Cal.App.4th 1121 [38 Cal.Rptr.2d 335], a case involving the crime of child molestation. (§ 647.6.) To violate section 647.6, the defendant must be " 'motivated by an unnatural or abnormal sexual interest or intent.' " (*Maurer,* 32 Cal.App.4th at p. 1127, italics omitted; *People v.*

*Lopez* (1998) 19 Cal.4th 282, 289 [79 Cal.Rptr.2d 195, 965 P.2d 713].) The trial court in *Maurer* instructed the jury that to commit the crime the defendant must be both "motivated" by an impermissible sexual interest and that "motive" need not be shown. The Court of Appeal held that the conflicting instructions removed the issue of intent from the jury's consideration. (*People v. Maurer, supra,* 32 Cal.App.4th at p. 1127.)

Here, we cannot say the same. The trial court instructed the jury that to find the existence of the robbery-murder special circumstance, it "must find the murder was committed in order to carry out or to advance the commission of the crime of robbery," and that "the special circumstance is not present if the defendant's intent is to kill and the related felony of robbery is merely incidental to the murder." In sum, the instructions as a whole did not use the terms "motive" and "intent" interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous. (*People v. Seaton* (2001) 26 Cal.4th 598, 687 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

### 4. *Instruction on sequence of deliberation*

The trial court instructed the jury: "[I]f you are satisfied beyond a reasonable doubt that the defendant is guilty of murder of the first degree by reason of having committed murder in the perpetration or attempt to perpetrate the crime of robbery . . . the additional instructions which I'm now going to give you have no application. . . . [I]f you're satisfied beyond a reasonable doubt he's guilty of murder in the first degree by reason of having committed murder in the attempt to commit robbery, then it's murder in the first degree. If, on the other hand, you're not so satisfied beyond a reasonable doubt the killing occurred during a robbery, then the instructions I'm now going to give you on murder will apply." The court then instructed on premeditated first degree murder and on second degree murder.

Defendant contends this instruction impermissibly directed the jury to consider the theories of murder in a particular sequence. Although a court may restrict a jury from returning a verdict on a lesser included offense before acquitting on a greater one, it may not preclude the jury from considering lesser offenses during deliberations. (*People v. Berryman, supra,* 6 Cal.4th at p. 1073; *People v. Kurtzman* (1988) 46 Cal.3d 322, 324-325 [250 Cal.Rptr. 244, 758 P.2d 572].)

We find no error. Nothing in the trial court's instruction required the jury to consider felony murder or premeditated murder *before* it considered the lesser included offense of second degree murder. The court also instructed

the jury that there was no significance to the order of the instructions and that each instruction should be considered in light of all the others. We perceive no reasonable likelihood the jury felt constrained to proceed in the sequential manner defendant suggests. (*People v. Dennis* (1998) 17 Cal.4th 468, 537 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

### 5. *Consciousness of guilt*

Balestri testified that at a 1998 hearing defendant made a gesture with his hand formed like a gun pointed at her and mouthed "pow, pow." The trial court gave this instruction pertaining to Balestri's testimony: "If you find that defendant attempted to suppress evidence against him in any manner, such as by intimidation of a witness, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. . . . The intimidation referred to is the defendant's alleged gesture of simulating a gun with his hand which was made at a court proceeding." (See CALJIC No. 2.06 (6th ed. 1996).)

Defendant contends the trial court's specific reference to defendant's alleged gesture made the instruction improperly argumentative. In *People v. Johnson* (1992) 3 Cal.4th 1183 [14 Cal.Rptr.2d 702, 842 P.2d 1], we upheld a similar reference by the trial court to the conduct of the defendant in that case, noting that the court, as here, had instructed the jury that the defendant's conduct was " 'not sufficient in itself to prove guilt' " and the weight and significance of the evidence was for the jury to determine. (*Id.* at p. 1235.) We have previously noted the cautionary language in the instruction benefits the defendant by admonishing the jury of the limited use it may make of such potentially inculpatory evidence. (See *People v. Jackson, supra,* 13 Cal.4th at p. 1224.) Nothing in this case requires a different result.

### 6. *Reasonable doubt instruction*

The trial court instructed the jury on reasonable doubt with some language of its own formulation: "Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending upon moral [*sic*] evidence, that is, evidence which comes to you from the mouths of people, is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. [¶] The law does not require demonstration or that degree of proof which, excluding *all possibility of error*, produces absolute certainty,

for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces an abiding conviction in an unprejudiced mind." (Italics added.)

██ Defendant argues that the phrase "all possibility of error" rendered the instruction infirm because it precluded the jury from acquitting defendant if it had a "possible" doubt of his guilt. He contends the instruction reduced the prosecution's standard of proof below proof beyond a reasonable doubt by telling the jurors the possibility of defendant's innocence could not constitute reasonable doubt.

Defendant argues that in the instruction's first paragraph the word "possible" is treated as a synonym for "imaginary" in the phrase "possible or imaginary doubt," but in the second paragraph the word "possibility" in the phase "all possibility of error" is used less restrictively. Indeed, the language in the two paragraphs differs, but the language of the second paragraph is merely a reformulation of the first paragraph's "possible or imaginary doubt," language that United States Supreme Court has described as imparting "that absolute certainty is unattainable in matters relating to human affairs." (*Victor v. Nebraska* (1994) 511 U.S. 1, 13 [114 S.Ct. 1239, 1246, 127 L.Ed.2d 583].) We find no reasonable likelihood that the instruction used here led the jury to believe that it could not acquit defendant even if it had a possible doubt as to his guilt.

### F. *Cumulative Prejudice*

Defendant contends that even if we find no individual error in the guilt phase to have been prejudicial, the cumulative effect of the alleged errors requires reversal. (*People v. Hill, supra,* 17 Cal.4th at pp. 844-845.) Having identified only a single evidentiary error, which we found not prejudicial, there are no additional errors to accumulate.

### IV. PENALTY PHASE ISSUES

Defendant raises numerous claims of error relating to the penalty phase and to the validity of his death sentence. We need not reach these claims, however, given our finding that we must reverse the penalty of death because there was prejudicial error during death-qualification voir dire of the jury. For the same reason we need not reach defendant's additional claim of cumulative penalty phase error.

### V. DISPOSITION

The judgment is affirmed as to the guilt verdicts and the special circumstance finding, but it is reversed as to the sentence of death.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 11, 2002.