Filed 4/30/15  P. v. Smith CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064925 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE321948) |
| MICHAEL JOHN SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed as modified and remanded with directions.

Raymond Mark DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael John Smith of assault by means likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1) and battery with serious bodily injury (§ 243, subd. (d); count 2). It found true allegations that as to count 1, Smith personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a). As to both counts 1 and 2, it found true allegations that Smith had committed the offenses for the benefit of, at the direction, or in association with a criminal street gang—the San Diego Skinheads (the SD Skinheads gang)—with the specific intent to promote, further, or assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)) and that Smith had committed a hate crime in concert with another person. (§ 422.75, subd. (b).) In a bifurcated proceeding, the trial court found true allegations that Smith had two prior prison convictions (§§ 667.5, subd. (b), 668), one prior serious felony prior conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one strike prior conviction (§§ 667, subds. (b)-(i), 1170.12, 668). The court later struck Smith's prior prison convictions under section 1385 and sentenced him to a prison term of 26 years, consisting of an eight-year term (double the four-year upper term) on count 1, a 10-year term for the gang enhancement, a three-year term for the hate crime enhancement, and a five-year term for Smith's prior serious felony conviction. It imposed but stayed a three-year enhancement on count 1 for the great bodily injury finding. On count 2, the court imposed but stayed under section 654 an upper term of

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

eight years, a 10-year term for the gang enhancement, and a three-year term for the hate crime enhancement.

Smith contends the court erred by admitting evidence relating to handwritten jail notes or "kites" because the evidence lacked probative value and any relevance it had was outweighed by risk of confusion and undue prejudice. He further contends the 10-year enhancement attached to his count 2 conviction is unauthorized and the matter should be remanded for resentencing. The People concede the latter point, but argue Smith's aggravated battery conviction constitutes a serious felony under section 1192.7, subdivision (c)(8), subjecting him to a five-year gang enhancement. We modify the judgment to reduce the 10-year gang enhancement on count 2 to a five-year enhancement under section 186.22, subdivision (b)(1)(B), which is stayed under section 654. As modified, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On July 2, 2012, Thomas Murray, a Caucasian man who was then a member of the predominantly African-American West Coast Crips, was serving time as an inmate in the San Diego County Jail in module 5-B when he was physically assaulted by Smith and Arren Dangler. Surveillance cameras recorded the incident. At the time, Smith was 36 years old and Dangler was 29 years old. Murray believed he was "greenlighted"—that a "hit" was put on him to kill or maim him—because he was a white man who "r[a]n with the blacks." After the incident, Dangler was visibly angry and pacing back and forth in his cell with clenched fists, yelling, "I can't believe you motherfuckers set me up like that, SDSH Bitch, Skinheads. You motherfuckers are lucky I didn't kill him. You guys did

3

this by putting me in here with that motherfucker."  Smith was not heard saying anything, and the surveillance cameras did not record audio.

Deputies found Murray bloody and on the floor of his cell.  He was unresponsive and unconscious for a "pretty long period of time."  Murray was taken to a surgical intensive care unit where he remained for almost three days.  He suffered a traumatic brain injury and internal bleeding in three areas of his brain, his nose was fractured, and he had multiple contusions and lacerations on his head and face requiring multiple sutures.

After the attack, Smith was moved to the George Bailey Detention Center, and on October 26, 2012, a sheriff's deputy found a small handwritten note in house 4. According to deputies, such notes are used to pass information between inmates, and they are usually concealed in some way on the inmate's clothing or body.  It was also common for kites to end up all over the jail; they were not restricted to only one housing unit.  At the time the note was found, Smith was placed in house 6, which was a separate building about 200 feet away from house 4.

*In Limine Motion and Evidence Code Section 402 Hearing*

Before trial, the prosecution moved to admit into evidence the jail note found in October 2012 by sheriff's deputies and other notes found on December 9, 2012. According to the People, the October 2012 note, addressed to "Tipsy," was found in cell 129 in module 4B and was signed with Smith's SD Skinheads gang moniker, "Spanky." It referred to Tipsy's name being in the note writer's paperwork "concerning the white crip me and my crimie almost killed downtown in 5B."  The People argued the notes

4

should be admitted into evidence because there was ample evidence linking Smith to them, including the fact the writer identified himself as "Spanky" in the notes, Smith used that moniker in his email address, and the notes described facts only the attacker would know. The People further argued that if not admissible, their gang expert, former San Diego County Sheriff's Detective Ellen Vest, could rely on the notes as a basis for her expert opinions.

The trial court conducted an Evidence Code section 402 hearing concerning the jail notes. After the People presented evidence, the prosecutor argued that the October 2012 note, exhibit No. 38, would go to Detective Vest's opinion as to whether Smith associated with the SD Skinheads gang, and that Smith was "directing and calling shots for the San Diego Skinheads." After the hearing, the court declined to admit the jail notes into evidence, but ruled Detective Vest could opine based on the evidence that Smith was in fact a gang member based on the information within the notes. The court ordered Vest to "talk in generalities" and not specifically quote from the notes.

*Testimony of Detective Vest*

At trial, Detective Vest testified about the SD Skinheads gang: that it was a San Diego County white supremacist gang that began in the 80's but was only recently documented in 2012. She testified that the gang's primary activity included unlawful homicide, assaults with a deadly weapon, felony battery, felony witness intimidation, robbery, drug sales and transportation, vehicle theft, felony grand theft, residential and commercial burglary, felony possession of weapons, felony vandalism and identity theft. She recounted several convictions of SD Skinheads gang members.

Detective Vest testified that respect was a significant part of gang culture; that to gain respect, a person has to "put in work" for the gang, that is, participate in some criminal activity for the gang's benefit. She explained that when a gang member calls out the name or letters of a gang after committing a crime, it shows the crime was committed in association with the gang.

According to Detective Vest, Smith had tattoos that were consistent with association and membership in a skinhead gang generally, including the word "skinhead" across the top of his chest, as well as a war bird and swastika in the center of his chest. He also had a German-type helmet with the letters, "SS," and a portrait of Hitler.[2] Detective Vest was asked about writings that indicated Smith was giving orders to SD Skinheads gang members or was authoritative, and she referred to writings in which Smith called himself a "shot caller," stated that he had the keys to certain floors in the jail, and that he was calling the shots for not only SD Skinheads but a lot of other white inmates. She testified the writings showed Smith was "working together with San Diego Skinheads to run the jails. Inside he's calling the shots; he is giving the orders. He's calling himself the number one person. And he's calling another individual who is [a SD Skinheads gang member], a documented [SD Skinheads member], his number two person." Detective Vest opined that the writings showed Smith had a close association with the SD Skinheads gang, and also mentioned the Aryan Brotherhood, which was a

---

2    Detective Vest testified that a probation report stated that Smith also had tattoos of a five pointed star and certain letters representing the United Society of Aryan Skinheads, but Smith demonstrated at trial that he did not have such tattoos.

very powerful white supremacy prison gang. She testified it was very uncommon in gang culture for a younger gang member to give orders to an older and more senior gang member. Detective Vest admitted on cross-examination that Smith was not a documented SD Skinheads gang member as of July 2, 2012.

*Defense Evidence*

Dangler testified in Smith's defense that he had just met Smith on July 2, 2012, when Smith entered module 5-B, and that before that date Smith was not a member of the SD Skinheads gang. Dangler testified that when Smith arrived, he noticed Smith had tattoos that indicated he was familiar with "prison politics," and so Dangler instructed Smith to come to his cell where there were three other white inmates, had him look at what Murray was doing, and told Smith that Dangler was going to "take this dude [Murray] out," meaning he was going to severely beat or murder him, and wanted Smith to come with him. Dangler testified he did not give Smith any option. According to Dangler, Smith was "highly hesitant," but Dangler became extremely irritated and told him they were going, and other words to the effect that if Smith did not go, Dangler would physically assault Smith. Dangler testified that during the attack on Murray, Smith yelled at him to stop because Dangler was going to kill Murray.

*Renewal of Request to Admit Exhibit No. 38 and Court's Ruling*

Following Dangler's testimony, the prosecutor renewed his request to admit into evidence exhibit No. 38, the October 2012 jail note addressed to Tipsy. The prosecutor argued the note directly rebutted Smith's theory of duress and Dangler's testimony that Smith did not speak up but went along with him, and it showed instead that Smith was a

7

person of authority: that he "has the keys to the jail." He sought to introduce the note for the truth of the statements that Smith was "running things in the jail; that he is in control of things in the jail." Defense counsel responded that the note was not authenticated and had no foundation, Detective Vest had already testified as to Smith's status, the writing was not probative to Smith's status as of July 2, 2012, and the note was extremely prejudicial. The court ruled that the trial evidence, the personal information in the note, and Smith's location suggested he was the note's author. It ruled exhibit No. 38 was relevant and admissible based on Dangler's testimony to the issue of whether Smith was in fact someone in authority, and it was for the jury to determine exhibit No. 38's weight. It ordered the exhibit be redacted to eliminate a statement concerning an individual needing to "be whacked asap."

*Detective Vest's Testimony on Recall*

Detective Vest was recalled to discuss exhibit No. 38. She opined that Smith wrote it because it was signed by "Spanx" or "Spanky"; Detective Vest knew Spanky to be Smith's moniker; and below that signature were the numbers "14" and "88" with a swastika, all references with significance to skinheads. The jail note indicated the author was housed in 6-C. Detective Vest believed that "Tipsy" was Aaron Taylor, a known associate of the SD Skinheads gang. The note contained references to two other documented SD Skinheads gang members. She testified that the author of the jail note was calling himself out as a "key holder" or leader in the jail and requesting a "roll call" of all white inmates: a list of all those aligned with the SD Skinheads gang. As for the note's statement: "somehow your name is in my paperwork concerning the white crip me

8

and my crimie almost killed downtown in 5-B," Detective Vest testified a "crimie" is someone with whom a person commits a crime. She explained that an inmate could subject himself to discipline from other gang members by falsely claiming to be in a position of authority in a white supremacist prison gang.

## DISCUSSION

### I. *Admission of Jail Note Evidence*

Smith contends the trial court deprived him of his rights to due process, a fair trial, and a reliable determination of the charges when it admitted the jail note evidence for what he characterizes as the "irrelevant, confusing, and highly prejudicial point that [he] had later acquired special status in the gang . . . ." We address his points seriatim, keeping in mind that the court's decision on admissibility of evidence is reviewed for abuse of discretion. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)

### A. *Authentication*

First, Smith suggests there are "logical and chronological breaks" between the note and the incident, which assertedly show the prosecution did not establish a "necessary prerequisite for any relevancy," that is, that the note was actually written by him. Smith argues the link between him and the note is "tenuous at best" because the note was found four months after the incident; other inmates in the jail may have used the moniker "Spanky"; the note was not found in his possession, his cell, or in the control of someone shown to be connected with him or any gang; and it was discovered in a part of the jail that was completely separate from where the incident occurred.

9

Based in part on Smith's reliance on Evidence Code section 1400, we understand his claim to be that the jail note was not authenticated. "A writing is admissible if a finding of authentication is supported by a preponderance of the evidence. [Citation.] The proponent of a writing satisfies the requirement of authentication when he or she introduces evidence sufficient to sustain a finding that the writing is what it is purports to be. [Citation.] Even if conflicting inferences can be drawn from the evidence supporting authentication, that consideration goes to the weight of the evidence and not to its admissibility." (*People v. Lucas* (2014) 60 Cal.4th 153, 262.) And "[t]he means of authenticating a writing are not limited to those specified in the Evidence Code. [Citations.] For example, a writing can be authenticated by circumstantial evidence and by its contents." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187, citing Evid. Code, § 1410 ["[n]othing in this article shall be construed to limit the means by which a writing may be authenticated or proved"] & *People v. Gibson* (2001) 90 Cal.App.4th 371, 383; see also Evid. Code, § 1421 [writing may be authenticated by evidence that it refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent to be the writing's author].)

By his arguments, Smith asks us to speculate (i.e., that other inmates may have had the moniker "Spanky"), or draw inferences in *his* favor from the evidence, as opposed to inferences that may be reasonably drawn in favor of the trial court's ruling. Here, evidence that Smith's gang moniker is Spanky permits a reasonable inference that the note, signed by "Spanky" or "Spanx," was written by Smith. Evidence of the manner and location of the crime against Murray permits a reasonable inference that Smith wrote

10

the note because the note's reference to almost killing a "white crip" with another "crimie . . . downtown in 5B" is sufficiently close to the facts of the crime and are facts that Smith would know as the attacker.  The note's indication that its author was in house 6-C, where Smith was housed when the note was found, supports the other evidence suggesting that Smith was the note's author.  Finally, because it was common for jail notes to be transferred between inmates in different cells or even houses, the fact Smith was housed separately from where the note was found does not cut against the trial court's ruling.  We conclude the People presented evidence from which the trial court properly ruled the note was sufficiently what it purported to be.  (Accord, *People v. Lynn* (1984) 159 Cal.App.3d 715, 735.)[3]

B.  *Relevance*

Smith further argues that the note does not logically or factually support the prosecution's purpose in admitting it, which was to rebut the defense theory that he acted under duress but instead shows he was a "shot-caller" at the time of the incident.  Smith

---

[3]	In *People v. Lynn*, *supra*, 159 Cal.App.3d 715, the defendant challenged admission of two handwritten notes on grounds they had not been authenticated as his. The notes had been received by a man named Morgan while in jail.  (*Id*. at p. 734.)  The notes, which were not in the handwriting of the defendant or Morgan and were addressed to a person named "Bob," contained exculpatory statements in connection with the charged crime of first degree murder, and advised Morgan his testimony could reduce the crime to second degree murder.  (*Id*. at p. 735.)  After Morgan turned the notes over to authorities, the defendant told him he had " 'really f[ ]up, giving the notes over.' "  (*Id*. at p. 735.)  This court held that in addition to defendant's statement to Morgan, which fulfilled the authentication requirements of Evidence Code section 1414, the writing's contents, and the veiled threats of harm to Morgan if he testified adversely to the defendant "ma[de] it unlikely anyone other than [the defendant] authored the notes" and thus the notes were properly authenticated under Evidence Code section 1421.  (*Id*. at pp. 735-736.)

points to evidence that he had entered 5-B only hours before the incident, he was not a documented member of the SD Skinheads gang, and the evidence was that a person had to "earn" power and authority by putting in work over time for the gang in jail. According to Smith, even assuming the truth of the People's position that he authored the note and was claiming leadership status in the gang, nothing in the note refuted the theory that *four months earlier*, in July 2012, he acted in response to someone else's directive.

We are unpersuaded by these arguments. Relevant evidence under Evidence Code section 210 is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117, 127.) Except as otherwise provided by statute, all relevant evidence is admissible. (Evid. Code, §§ 350, 351; see also Cal. Const., art. I, § 28, subd. (d).) "[T]he trial court has broad discretion to determine the relevance of evidence." (*People v. Cash* (2002) 28 Cal.4th 703, 727.) Here, Smith boasts about the attack within the October 2012 jail note and his being a "key holder." This evidence, combined with Detective Vest's testimony, including her explanation about Smith's reference to Dangler as his "crimie" and her testimony concerning the low likelihood a younger inmate such as Dangler would order an older inmate such as Smith to perform such an attack, tend to show Smith was not forced into action, but willingly participated in the attack notwithstanding it occurred four months before the note was written. Because the

12

evidence had a tendency to counter the defense theory that Smith had acted in duress, the trial court did not err in admitting it.

C. *Risk of Prejudice*

Finally, Smith contends that whatever the note's "miniscule" probative value, it was outweighed by the risk of undue prejudicial and inflammatory effect, and confusion to the jury in determining the actual issues. The premise of this argument, based on cases such as *People v. Albarran* (2007) 149 Cal.App.4th 214, *People v. Avitia* (2005) 127 Cal.App.4th 185, and *People v. Williams* (1997) 16 Cal.4th 153, is that gang-related evidence, or just mention of the word "gang," is inflammatory and creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the charged offense. In view of this, Smith argues: "This was more than just the mere mention of the word 'gang' and it was more than just evidence of mere membership— bare facts which themselves can raise the specter of unfair prejudice. [Citations.] This was evidence introduced for the specific purpose of showing Smith was a gang leader and authority, and in the very gang for whose benefit, promotion, and advancement the incident was allegedly perpetrated." (Italics omitted.)

We see no merit to this argument. A court, in its discretion, may exclude relevant evidence "if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, italics added.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little

13

effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 [Evidence Code section 352 does not make evidence inadmissible merely because it is highly damaging to the defendant].)

We have already rejected the premise of Smith's argument that the evidence had only "miniscule" relevance for balancing against its potentially prejudicial effect. When gang-related evidence is relevant to prove something other than the defendant's disposition to commit crimes, it does not constitute inadmissible character evidence. (See, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 131 [evidence showing the "workings and activities" of a gang, as well as photos of defendant's gang tattoos, was not character evidence because it was relevant to motive and identity].) The jail note was relevant not only to rebut Smith's defense theory of duress, but also to show Smith acted in association with and for the benefit of a criminal street gang, matters that Smith does not challenge on appeal.

And here, the trial court gave a limiting instruction to the jury about the purpose of gang-related evidence, that the jury "may not conclude from [evidence of gang activity] that the defendant is a person of bad character or that he has a disposition to commit crime." Such an instruction minimized the very sort of prejudice Smith urges would result from introduction of this evidence. In the absence of indications to the contrary, we presume the jury adhered to a court's instructions and did not consider the challenged evidence as improper or prejudicial character evidence. (*People v. Olguin*, *supra*, 31 Cal.App.4th at pp. 1373-1374.) Thus, we hold the trial court did not abuse its discretion

14

in concluding that the jail note evidence was admissible: that any prejudice flowing from its admission did not substantially outweigh its probative value.  Because we have held there was no error, we need not address Smith's prejudice arguments.

II.  *Claim of Unauthorized Sentence*

Smith contends the trial court imposed an unauthorized sentence on his count 2 conviction for battery with serious bodily injury.  Though he acknowledges the court properly stayed all of his sentences and enhancements on count 2, he maintains it incorrectly imposed the ten-year gang enhancement because under the version of section 186.22, subdivision (b)(1) operative at the time of the offense, battery with serious bodily injury was not an enumerated "serious" or "violent" felony offense.  He argues that "the only potentially conceivable theory under which the battery conviction could have constituted a 'violent' felony offense for purposes of section 667.5 would be that the crime was a felony in which Smith inflicted 'great bodily harm on any person other than an accomplice *which has been charged and proved as provided for in Section 12022.7, 12022.8, or 12022.9* on or after July 1, 1977,' " but the prosecution neither alleged nor proved such an element with regard to the count 2 battery.  Smith argues the trial court should have sentenced him under the general sentencing scheme to a stayed term of two, three or four years in the court's discretion, and he asks that we remand the matter for resentencing.

The People agree that the ten-year enhancement was unauthorized and should be stricken.  However, they argue Smith is subject to a five-year enhancement because under

15

section 1192.7, subdivision (c)(8),[4] a "serious felony" means any felony in which the defendant personally inflicts great bodily injury on any person and " 'serious bodily injury,' as required for an aggravated battery conviction, is 'essentially equivalent' to 'great bodily injury' " so Smith's aggravated battery conviction constitutes a serious felony subjecting him to a five-year term.  The People argue remand is unnecessary because this court can strike the 10-year gang enhancement and impose the five-year enhancement attached to count 2.

Under the version of section 186.22 in effect at the time of Smith's 2012 offense, a person who commits a felony under circumstances indicating gang involvement is subject to increased punishment under section 186.22, subdivision (b)(1).[5]  Specifically, where the underlying felony is a violent felony under section 667.6, the increased punishment is 10 years (§ 186, subd. (b)(1)(C)); where the underlying felony is a serious felony under 1192.7, subdivision (c), the increased punishment is five years (§ 186, subd. (b)(1)(B)); and any other felony subjects the defendant to an additional term of two, three

[4]    Section 1192.7, subdivision (c)(8) defines a "serious felony" as, inter alia, "any felony in which the defendant personally inflicts great bodily injury on any person, other than any accomplice."

[5]    Section 186.22, subdivision (b)(1) provides for a sentence enhancement when the defendant "is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  There are three main aspects of this gang enhancement, namely, that the crime was (1) "committed for the benefit of, at the direction of, or in association with" (2) "any criminal street gang," as defined by the statute, and (3) the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1); see also *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.)

or four years at the court's discretion (§ 186, subd. (b)(1)(A)). The parties concede and we agree the count 2 offense in the instant case, aggravated battery, does not qualify as a "violent" felony (§ 667.5, subd. (c)), and therefore does not trigger the section 186, subdivision (b)(1)(C) 10-year enhancement.

The question is simply whether Smith's conviction for committing battery with infliction of serious bodily injury (§ 243, subd. (d)) constitutes a serious felony within the meaning of section 1192.7, permitting imposition of the five-year enhancement on count 2. As Smith points out, the jury did not make a finding as to whether he inflicted great bodily injury as to that offense; it was instructed on great bodily injury (§ 12022.7, subd. (a)) solely as to count 1.[6] However, the jury was instructed on the element of serious bodily injury as to count 2 that "*serious bodily injury* means a serious impairment of physical condition" and that such injury "may include, but is not limited to: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, or a wound requiring extensive suturing and serious disfigurement."

Smith's argument against imposition of the five-year enhancement is based on this court's decision in *People v. Taylor* (2004) 118 Cal.App.4th 11, and the more recent California Supreme Court decision in *People v. Santana* (2013) 56 Cal.4th 999 (*Santana*). In *People v. Taylor*, the defendant was charged with battery causing serious

---

[6]    In part, the jury was instructed as to count 1 that "[g]*reat bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

17

bodily injury under section 243, as Smith was here, but the defendant in *Taylor* was also charged with the great bodily injury enhancement under section 12022.7. (*Taylor*, 118 Cal.App.4th at pp. 17-18.) The jury, however, found all great bodily injury enhancements to be not true. (*Id.* at pp. 18, 21, 23.) Under those circumstances, this court was required to decide whether the defendant's prior conviction for battery causing serious bodily injury qualified as a serious felony under section 1192.7, subdivision (c)(8) notwithstanding the fact the jury specifically found the defendant did *not* personally inflict great bodily injury in the commission of the charged offenses. The attorney general argued the battery was a "serious felony" under section 1192.7 for purposes of a five-year enhancement under section 667, subdivision (a)(1) because the jury's finding of serious bodily injury was equivalent to a finding of great bodily injury. (*Taylor*, 118 Cal.App.4th at p. 22.)

This court disagreed. "In *the particular circumstances of this case*, the conviction for battery with serious bodily injury is not legally or factually equivalent to a finding of great bodily injury." (*People v. Taylor*, *supra*, 118 Cal.App.4th at p. 24, italics added.) Though the attorney general's argument had support in case law (see *People v. Moore* (1992) 10 Cal.App.4th 1868), that case was distinguishable because "the record of Moore's battery prior did not include any finding that he had *not* inflicted great bodily injury in committing the prior offense. The trial court's conclusion that the prior offense was a serious felony thus did not conflict with the express findings of the trier of fact. In the absence of any contrary indication in the record, the trial court in *Moore* was justified in applying the *usual assumption* that 'great bodily injury' and 'serious bodily injury' are

18

'essentially equivalent.' " (*Taylor*, at p. 26, italics added, citing *Moore*, 10 Cal.App.4th at p. 1871.) *Taylor* presented an obvious problem that renders it distinguishable: the jury there had expressly found that the great bodily injury allegations were "not true" and thus this court was unwilling to permit the trial court to "make what amounted to a legal determination that Taylor had in fact inflicted great bodily injury." (*Taylor*, 118 Cal.App.4th at p. 27.) *Santana* is likewise distinguishable. There, the issue before the California Supreme Court was whether the standard jury instruction for the offense of mayhem, CALCRIM No. 801, properly included a requirement that the prosecution prove the defendant cause serious bodily injury. (*Santana*, *supra*, 56 Cal.4th at pp. 1005-1011.) In concluding it did not, the court pointed out that "serious bodily injury" was not mentioned in the mayhem statute, section 203, nor was a "serious impairment of physical condition," but CALCRIM No. 801 explained its definition of serious bodily injury had been drawn from a case holding that "great bodily injury" was an element of mayhem. (*Santana*, at pp. 1007-1008.) The California Supreme Court stated: "We recognize that the terms 'serious bodily injury' and 'great bodily injury' have been described as ' " 'essential[ly] equivalent' " ' [citation] and as having 'substantially the same meaning' [citation]. [Citation.] However, the terms in fact 'have separate and distinct statutory definitions.' [Citation.] *This distinction may make a difference when evaluating jury instructions that provide different definitions for the two terms*. [Citation.] Thus, *in this context where we must consider a jury instruction's precise language*, we cannot conclude that the offense of mayhem includes a serious bodily injury requirement simply

19

based on cases holding that mayhem includes a great bodily injury component." (*Id*. at pp. 1008-1009, italics added.)

*Santana* was decided in the context of proper jury instructions and does not bear on the question before us.[7] The *Santana* court recognized that the terms at issue have distinct statutory definitions, a point with which we do not quarrel, but that circumstance does not bar a trier of fact from assessing whether a particular set of proven facts on which a jury found the defendant inflicted *serious* bodily injury will support an enhancement that requires a finding of infliction of *great* bodily injury.

In short, we are not precluded from applying the usual rule, recognized by the California Supreme Court, that serious bodily injury and great bodily injury " 'are essentially equivalent elements.' " (*People v. Burroughs* (1984) 35 Cal.3d 824, 831, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 89; see also *People v. Knoller* (2007) 41 Cal.4th 139, 143, fn. 2; *People v. Wade* (2012) 204 Cal.App.4th 1142, 1149-1150 [citing cases]; *People v. Arnett* (2006) 139 Cal.App.4th 1609, 1613 [citing cases].) In this case, the jury's finding that Smith inflicted serious

---

[7] Additionally, the language of the mayhem statute contains neither the terms serious bodily injury or great bodily injury. (§ 203 ["Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem"].) Indeed, the *Santana* court pointed out the examples of serious bodily injury given in CALCRIM No. 801 were inconsistent with the mayhem statute and the court found "no basis—compelled either by case law or by the need to give jurors further guidance—to superimpose a wholesale definition of 'serious bodily injury' from section 243[, subdivision] (f)(4)" in the instruction. (*Santana*, *supra*, 56 Cal.4th at p. 1010.)

20

bodily injury, which was amply supported by the evidence, was sufficient to bring his offense within the purview of subdivision (c)(8) of section 1192.7 for purposes of imposing a five-year gang enhancement under section 186.22, subdivision (b)(1)(B).

## DISPOSITION

The judgment is modified to reduce the 10-year enhancement imposed on count 2 under Penal Code section 186.22, subdivision (b)(1)(C) to a five-year enhancement under section 186.22, subdivision (b)(1)(B), which is stayed under section 654. The judgment is affirmed as modified. The matter is remanded with directions that the superior court prepare an amended abstract of judgment to reflect these modifications to the judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.

21