Filed 5/5/16  P. v. Welch CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAMIEN WELCH,<br><br>    Defendant and Appellant. | H041135<br>(Santa Cruz County<br>Super. Ct. Nos. F23778, F22135) |

Defendant Damien Welch burglarized three homes in Santa Cruz County in 2011 and 2012.  In the burglary occurring on November 21, 2012, the owners saw defendant leaving their house.  One of the owners, Daniel Friedman, chased defendant as he fled.  Friedman testified that defendant twice threatened him with a gun during the chase.

After pleading no contest to one count of first degree residential burglary (Pen. Code, § 459),[1] defendant was convicted by a jury of two counts of first degree residential burglary (§ 459) and one count of second degree robbery (§ 211).  The court sentenced defendant to an aggregate term of eight years in prison.

Defendant contends the trial court erred by refusing a proposed instruction that in order to find defendant guilty of robbery, the jury needed to find that defendant intended to permanently deprive the victim of his property and that defendant had not abandoned

---

[1] Further statutory references are to the Penal Code.

the property at the time he used force or fear. Defendant argues that the evidence supported the giving of this pinpoint instruction and the court committed prejudicial error in refusing it.

We conclude there was no instructional error. Accordingly, we will affirm the judgment.

FACTS

*I.      November 21, 2012 Santa Cruz Incident (Counts 1 and 2)*

In the early afternoon of November 21, 2012, Vinnie Hansen and her husband, Daniel Friedman, arrived at their Santa Cruz home on Bostwick Lane after grocery shopping. As they walked from their car to their house, they heard a loud noise coming from their backyard. They saw a man, whom they identified as defendant, climbing over the locked gate between their backyard and the front of the house. Defendant was wearing a backpack that appeared to be full. Hansen yelled at defendant, asking him what he had been doing in their house. Defendant stumbled when he scaled the gate, and Friedman saw his binoculars fall out of defendant's pack. Friedman kept his binoculars inside a dresser in his bedroom. Defendant ran off toward Seventh Street, wearing the backpack.

Hansen went inside the house and called 911. She noticed that the door leading from the kitchen to the backyard was ajar and there were striations on the door jam. She later noticed mud tracks leading from the kitchen to the master bedroom. Hansen saw that a dresser drawer and a bedside table drawer had been pulled open. She also noticed that her husband's everyday watch and his "dress[-]up watch" with a large case were missing. Hansen went into the backyard and observed that their Kindle, which had been in the bedroom, was on top of their covered hot tub. She also noticed at a later time that Friedman's wedding ring and a diamond pinky ring were missing.

Friedman chased after defendant on the sidewalk down Bostwick Lane. He gave chase because he thought defendant "had all of his stuff in [the] backpack" and Friedman

2

was determined not to let defendant get away with taking his property. Friedman yelled for help, saying the man he was chasing had broken into his house. Defendant stopped in front of a refuse enclosure at an elementary school and grabbed a gun out of his backpack. Friedman also stopped, and defendant pointed the gun at him, saying, " [']Stop chasing or I'll shoot.['] " Friedman, who was frightened by defendant's brandishing of the gun, described it as a medium-sized silver semiautomatic handgun. About 10 seconds later, defendant put the gun back into his backpack and started running down Bostwick toward Soquel Avenue.

After about 10 seconds, Friedman started to chase defendant again because he didn't want defendant to escape with his property. Defendant ran along an access road behind some businesses. He passed by the side of Chandler Automotive, a repair shop Friedman and his wife had used for years. As Friedman chased defendant, he yelled to two men outside the repair shop to call the police. The two men from the repair shop also gave chase, but suspended the effort when they saw that defendant had a gun.

Defendant stopped again. This time he was closer to Soquel Avenue on the same access road. He had the backpack in front of him and was discarding its contents on the ground. When Friedman got within about 20 feet of defendant, Friedman saw his watch winder case on the ground. Defendant again pointed the gun at Friedman, loudly telling him, " [']Back off or I'll kill you. ['] " Friedman was very fearful, and he crouched down and covered his face.

After about five seconds, defendant put the gun away and began running again without the items he had dropped on the ground. He rounded the corner of a parking lot for an auto services store. After waiting about 15 seconds, Friedman followed defendant and looked for him on Soquel Avenue, but did not see him. Friedman followed defendant because he was still trying to retrieve his belongings; he did not know whether defendant still had some of the stolen property in his backpack.

3

After losing defendant in the chase, Friedman went back to the spot where defendant had dropped items from his backpack. He saw Santa Cruz County Deputy Sheriff Randall Hop there, holding a rifle. Deputy Hop seemed to know who Friedman was. He asked Friedman if the property on the ground belonged to him. Friedman identified his Movado watch and watch winder, as well as his binoculars. Deputy Hop instructed Friedman to take the property, go home, and wait to be contacted.

A number of Santa Cruz city police officers and county deputies—10 or more—responded to the scene and staged a manhunt by setting up a perimeter. Defendant was ultimately apprehended in an area covered by trees, near a sound wall adjacent to Highway 1. A search of defendant's person did not yield anything. Defendant was very sweaty and his pants and shoes were muddy. Defendant asked the arresting deputy several times what crime he had committed. At one point, defendant asked if the charge was " ['] [R]obbery?['] " Police officers and deputies searched the area, but did not find a firearm or a backpack.

A short while after Friedman returned home, he met with Deputy Hop. The deputy told Friedman that a suspect was being detained and requested that Friedman come with him to see if Friedman could identify him. Deputy Hop drove Friedman to a location about one mile away, where officers in another patrol vehicle had a man exit the car for Friedman to observe. Friedman identified defendant as the man who had climbed over the gate of his home, whom Friedman had chased, and who had twice pointed a gun at him. Deputy Hop testified that Friedman positively identified defendant, and when the deputy asked his degree of certainty, Friedman said he was 100 percent certain. While Friedman was there, a second deputy handed him a second watch, a Seiko. Friedman positively identified the Seiko watch as belonging to him.

The parties stipulated that there was no dispute concerning the individual involved in the November 21, 2012 incident, and that defendant was the person who was chased by Friedman on that date.

4

## II.    *October 3, 2012 Soquel Incident (Count 3)*[2]

In October 2012, Andrew Andrako would on occasion stay overnight with his girlfriend, Kayla, at her home on Baronian Court in Soquel. Kayla lived with her brother, Bobby, and with her mother. On the afternoon of October 3, Andrako arrived at Kayla's home after work. After going into the kitchen, he heard noises upstairs that sounded like footsteps. Andrako investigated outside of Bobby's bedroom, hearing noises that appeared to be coming from the window. He went into the adjacent bedroom and looked out the window. Andrako saw a male—whom Andrako identified in court as defendant—standing in the backyard. Defendant threatened Andrako, saying he had a gun in his pants. Shortly after seeing defendant, Andrako saw another male who was "coming out of . . . Bobby's window." After the second person jumped down, he and defendant ran off.

The parties stipulated that defendant was the person in the backyard of the Baronian Court home on October 3, 2012.

## PROCEDURAL BACKGROUND

Defendant was charged by information in case No. F23778 filed on January 10, 2013, with four felonies: second degree robbery committed on November 21, 2012 (§ 211; count 1); first degree residential burglary committed on November 21, 2012 (§ 459; count 2); first degree residential burglary committed on October 23, 2011 (§ 459; count 3); and first degree residential burglary committed on October 3, 2012 (§ 459; count 4). It was further alleged that defendant was armed with a firearm in the commission of the crimes charged in counts 1 and 2 (§ 12022.5, subd. (a)(1)). Defendant pleaded no contest to count 3. Count 4 was then renumbered as count 3.[3]

---

[2] As defendant's appellate claim concerns only the robbery conviction (count 1), we present an abbreviated version of the facts concerning the count 3 conviction.

[3] Defendant was also charged by information filed February 27, 2012, in case No. F22135, with first degree residential burglary committed on January 27, 2012, a

(continued)

5

A jury trial commenced on February 27, 2014. On March 12, 2014, the jury found defendant guilty of second degree robbery (count 1), first degree residential burglary (count 2), and attempted first degree burglary, (a lesser included offense charged in count 3). The jury was unable to reach a verdict on the arming allegations, and the court declared a mistrial on those allegations.

On June 20, 2014, the court imposed an aggregate prison sentence of eight years. Defendant's sentence was based upon an upper-term sentence of six years for the count 2 conviction (declared to be the principal term), together with consecutive sentences of one year four months (one-third of the middle term) for the count 3 conviction (the first-degree residential burglary count to which defendant pleaded no contest), and eight months (one-third of the middle term) for the count 4 conviction (the first degree residential burglary count tried to a jury). The court also imposed a three-year sentence for the count 1 (robbery) conviction, but stayed that sentence pursuant to section 654.

DISCUSSION

I. *Claim of Instructional Error*

A. Background and Contentions

As a supplement to instructions concerning the robbery count, defendant requested that the trial court give the following pinpoint instruction: "In order to find Mr. Welch guilty of committing a robbery as charged in Count 1 you must also find that: [¶] Mr. Welch intended to permanently deprive Mr. Friedman of his property and had not abandoned it at the time the use of force or fear occurred." The court denied this request, concluding the instruction it gave, patterned after CALCRIM No. 1600 (discussed, *post*),

felony (§ 459; count 1); receiving stolen property, a felony (§ 496, subd. (a); count 2); and resisting, obstructing or delaying a peace officer, a misdemeanor (§ 148, subd. (a)(1); count 3). On April 24, 2012, defendant pleaded no contest to counts 2 and 3, and count 1 was dismissed in the interests of justice. The court granted probation. Case No. F22135 is not pertinent to this appeal.

6

"adequately describe[d] all of the elements that need[ed] to be satisfied by the People in order to obtain a conviction in relationship to Count 1."

Defendant contends this was error. He argues the instruction the court gave based upon CALCRIM No. 1600 "fail[ed] to address . . . a critical issue in this case—the legal significance of a defendant's having surrendered the property during the chase and the relationship of that conduct to the subsequent use of force required for robbery." He asserts that ample evidence existed for the giving of the pinpoint instruction, and the error was prejudicial under either the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18) harmless beyond a reasonable doubt standard, or the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818) standard that it is reasonably probable defendant would have achieved a more favorable outcome in the absence of the error.

The Attorney General responds that there was no error. She contends the robbery instruction given by the court adequately addressed each element, including the requirement that defendant must have had possession of the property at the time force or fear was used. She argues that "even if the jury instructions had somehow been less than perfect, the attorneys' closing arguments would have clarified any confusion."

### B.       No Error in Denial of Requested Pinpoint Robbery Instruction

In appropriate circumstances, " 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case.' " (*People v. Coffman* (2004) 34 Cal.4th 1, 99 (*Coffman*), quoting *People v. Bolden* (2002) 29 Cal.3d 515, 558.) Specifically, a criminal defendant "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt . . ." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) But the court may decline a requested " 'pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]. [Citation.]' " (*Coffman*, at p. 99; see also *People v. Wright* (1988) 45 Cal.3d 1126, 1134 [pinpoint instruction properly rejected when it is repetitious of other instructions given].)

7

Robbery is a type of aggravated larceny. (*People v. Gomez* (2008) 43 Cal.4th 249, 254-257 (*Gomez*). "To elevate larceny to robbery, the taking must be accomplished by force or fear and the property must be taken from the victim or in his [or her] presence." (*Id.* at p. 254, fn. omitted.) The force or fear component need not be perpetrated by the defendant at the time he or she initially procures the property. A mere theft becomes robbery " 'if [a] perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot. [Citations.]' " (*Id.* at p. 257, quoting *People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8; see also *People v. Williams* (2013) 57 Cal.4th 776, 787 [larceny being "a continuing offense, a defendant who uses force or fear in an attempt to escape with property taken by larceny has committed robbery"].) This variation of the crime—where a crime that is initially larceny is converted to robbery by use of force or fear to prevent the victim from regaining possession of the property—is sometimes referred to as "an *Estes*-type robbery." (*People v. Pham* (1993) 15 Cal.App.4th 61, 68 [referring to *People v. Estes* (1983) 147 Cal.App.3d 23].)

As noted, defendant contends the trial court erred by refusing to instruct the jury that to find that a robbery occurred, it had to conclude that he (defendant) had not abandoned the property at the time he used force or fear against the victim. The instruction the court gave—with significant revisions to CALCRIM No. 1600 that are italicized here— provided in relevant part: "To prove that the defendant is guilty of [robbery], the People must prove that: [¶] 1. The defendant took property that was not his own; [¶] 2. The property was taken from another person's possession and immediate presence *or the person was prevented from regaining control over the property in their immediate presence*; [¶] 3. The property was taken against that person's will; [¶] 4. The defendant used force or fear to take the property or to prevent the person from resisting *or to maintain possession of the property*; [¶] AND [¶] 5. When the defendant used force or fear to take the property, he intended to deprive the owner of it permanently or to remove

8

it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.  [¶] The defendant's intent to take the property must have been formed before or during the time he used force or fear."  (Italics added.)

Significantly, the robbery instruction the court gave modified the third element provided in the standard CALCRIM No. 1600 instruction—by specifying an alternative *Estes*-type variant of the crime of robbery—that "the person was prevented from regaining control over the property in their immediate presence."  This was the precise form of robbery argued by the People.  Likewise, the court's instruction as to the fourth element—instead of the standard CALCRIM No. 1600's statement that "[t]he defendant used force or fear to take the property or prevent the person from resisting"—added the alternative component that "[t]he defendant used force or fear . . . to maintain possession of the property."  These modifications—coupled with the fifth element regarding defendant's having had the intent to steal when he used force or fear—conveyed to the jury that it could find defendant guilty of robbery only if defendant (1) used force or fear to prevent Friedman from regaining possession of his property, (2) intended to do so when he used the force or fear, and (3) had possession of Friedman's property when he did so.  The instruction would otherwise make no sense.  How could defendant have prevented Friedman from regaining control over his property by employing force or fear if defendant had already abandoned the property?  Absent an indication of juror confusion—which does not appear anywhere in the record—we will assume the jury understood the robbery instruction given by the court in a common sense fashion.  (See *People v. Coddington* (2000) 23 Cal.4th 529, 594 [assuming jurors adopt common sense meaning of instructions], superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1107, fn. 4.)

Since the instruction given by the court apprised the jury that defendant needed to possess the stolen property at the time he directed force or fear toward Friedman, the

9

pinpoint instruction proffered by defendant was superfluous. The trial court therefore did not err in refusing to give it. (See *People v. Cash* (2002) 28 Cal.4th 703, 736 [court properly refused defendant's pinpoint instruction where it "redundantly instructed on when defendant must form an intent to rob"]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [standard manslaughter instructions given by court "adequately covered the valid points in the proposed pinpoint manslaughter instructions"].)

We also note that the arguments of counsel clearly delineated the issue of whether defendant had abandoned the stolen property at the time he used force or fear toward Friedman. The prosecutor argued that when defendant pointed the gun at Friedman a second time (according to the victim's testimony), there had been "no abandonment of any property or any [']I give up['] by Damien Welch because he's not done." The prosecutor argued that another witness had observed defendant dropping more property from his backpack after Friedman had ceased chasing him. The prosecutor also argued that robbery includes an instance in which force or fear is used upon a victim to prevent the victim from regaining possession of the stolen property, and that even after defendant had dumped property from his backpack, "he still has property; the rings and at a minimum the Seiko watch." Defense counsel argued that, as to whether defendant used force or fear with intent to maintain possession of the property: "What does he do? He dumps it. He's running to avoid contact."

Defendant relies on *People v. Hodges* (2013) 213 Cal.App.4th 531 (*Hodges*) in support of his position that the trial court erred in refusing his requested pinpoint instruction. *Hodges* does not advance defendant's position. There, a grocery store loss prevention officer observed the defendant shoplifting. The officer followed the defendant to the parking lot and found him seated in a car with the driver's side door open. After the officer identified himself and asked the defendant to return to the store, the defendant offered to give back the goods. The officer refused and the defendant started the car's engine. A second loss prevention officer (Anderson) approached and instructed the

10

defendant to return to the store.  As the defendant got out of the car, he " 'shoved' " or " 'tossed' " the goods at Anderson.  The defendant jumped back into the car and attempted to flee.  Anderson was injured after he reached inside the car to turn off the engine as the defendant backed out of the parking stall to drive away.  (*Id.* at pp. 535-536.)

The trial court in *Hodges* refused defense counsel's request for a pinpoint instruction to the effect that if the defendant had abandoned the property before he used force or fear, he could be convicted of theft, but not robbery.  (*Hodges*, *supra*, 213 Cal.App.4th at p. 537.)  During deliberations, the jury submitted two notes concerning the CALCRIM No. 1600 robbery instruction given by the court, asking:  " 'Robbery (Penal Code 211) Point 4 states "The defendant used force or fear to take the property or to prevent the person from resisting."  [¶] As stated, the defendant would be guilty here only if force or fear was used during the commission of the theft.  [¶] However, the force/fear was subsequent to the act, in the parking lot, after the defendant had surrendered the goods (throwing them at Mr. Anderson).  [¶] Does the timing/sequence of events—theft, then force/fear bear on the applicability of this clause—would point 4 apply here?' "  (*Id.* at p. 538.)  The trial court responded to the jury's question:  " 'With regard to Count 1, Penal Code 211, the theft is deemed to be continuing until the defendant has reached a point in which he is no longer being confronted by the security guards.  Thus, item 4 of the instruction 1600 applies to the confrontation in the parking lot.' "  (*Ibid.*)  The court overruled defense counsel's objection to the response that " '[t]he theft ceased after he no longer had the intent to maintain, to keep the property.' "  (*Ibid.*)

On appeal, the defendant in *Hodges* asserted error in connection with the trial court's response to the jury's question, but not with respect to the denial of counsel's requested pinpoint instruction.  The appellate court concluded that "the jury sought legal guidance on whether [the] defendant could be convicted of robbery if they determined he 'surrendered' the goods prior to the use of force."  (*Hodges*, *supra*, 213 Cal.App.4th at

11

p. 541.)  It held that the trial court's response to the jury question "failed to address the crux of the jury's inquiry" and was misleading "because it allowed the jury to conclude [the] defendant was guilty of robbery without regard to whether [the] defendant intended to permanently deprive the owner of the property at the time the force or resistance occurred." (*Id.* at p. 543.)  The appellate court also held that the trial court's response "improperly resolved the factual conflict inherent in the jury's inquiry regarding the impact of [the] defendant's surrender of the goods prior to the use of force." (*Ibid.*, fn. omitted.)

This case is distinguishable from *Hodges*.  First, the defendant in *Hodges* did not claim error with respect to the denial of the requested pinpoint instruction.  Second, in *Hodges* (unlike here), the trial court gave CALCRIM No. 1600 without tailoring it to the facts of the case, i.e., without presenting alternative language applicable to an *Estes*-type robbery.  (See *Hodges*, *supra*, 213 Cal.App.4th at p. 537.)  Third, and perhaps most significantly, in *Hodges*, there was a question posed by the jury during deliberations that was specifically directed to the issue of whether robbery could occur if the defendant had abandoned the property when the force or fear was used, and the trial court's response to that inquiry was inadequate.  Here, there was no such jury question, no indication of potential jury confusion, and no misleading or incomplete statement from the court.

The court's instruction patterned after CALCRIM No. 1600 but modified to include an *Estes*-type robbery adequately apprised the jury of the elements of the robbery count, including that defendant must have had possession of the stolen property at the time he used force or fear to prevent the victim from regaining possession of it.  Defendant's proposed pinpoint instruction was therefore redundant and unnecessary, and the court did not err in refusing to give it.

## DISPOSITION

The judgment is affirmed.

12

_____
                              Márquez, J.

WE CONCUR:


_____
Rushing, P.J.




_____
Grover, J.




People v. Welch
H041135