Filed 3/1/23  P. v. Smith CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B316904 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA497252) |
| FRANK LEE SMITH, III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant Frank Lee Smith III was convicted after a jury trial for inflicting injury on a cohabitant, namely his girlfriend Laura G.,[1] and for violating a prior domestic violence restraining order protecting Laura. Defendant now appeals, arguing prejudicial error in the prosecutor's closing argument requires reversal of his conviction on the corporal injury count. We disagree and affirm.

## FACTUAL BACKGROUND

Defendant was in a relationship with Laura for several years and was the father of her child. Their relationship included several incidents of domestic violence.

### A.    January 2020 Domestic Violence Incidents

In January 2020, Laura applied for a domestic violence restraining order. In support of that request, she declared in her court filing that defendant was controlling and verbally abusive; she also declared that she was scared of him.[2]

Later in January 2020, Los Angeles County Sheriff's Deputy Joshua Munoz responded to a call and upon arrival found defendant and Laura. Laura had redness on her cheek and neck area in the shape of a handprint. When Deputy Munoz attempted to speak with Laura, defendant shouted "Tell him nothing happened, baby." Defendant kept trying to speak to Laura, so Deputy Munoz had the two of them separated.

_____

[1] We refer to Laura by her first name only pursuant to the guidance of California Rules of Court, rule 8.90(b)(4), and not out of any disrespect.

[2] At the criminal trial, Laura recanted these statements and claimed she wrote them only because the people helping her fill out the restraining order paperwork told her to do so.

When Laura was outside defendant's presence, she told Deputy Munoz that defendant and Laura were driving. They began arguing and pulled over. Laura got out of the car because she was nervous defendant would become violent based on past domestic abuse. As Laura walked away from the vehicle, defendant followed her. Defendant yelled at Laura to get back in the car; Laura was scared and complied. Once in the car, defendant grabbed Laura by her face.

Deputy Munoz ran defendant's information, learned Laura had a restraining order protecting her from defendant, and arrested defendant. On February 14, 2020, defendant pled no contest to a series of charges. The court granted defendant probation and issued a criminal protective order directing him not to contact Laura (case No. TA151278).

Defendant and Laura nevertheless continued to see each other. Defendant told Laura there was a restraining order prohibiting him from contacting her, and both he and Laura discussed trying to have it undone.

## B. The July 2021 Domestic Violence Incident

On July 22, 2021, defendant and Laura were observed arguing at a motel in Los Angeles. A resident of the motel, Casandra E., saw defendant try to grab Laura's phone. Casandra saw defendant grab Laura and hit her head against the wall sufficiently hard that Laura's head bounced off the wall. The motel also had a security camera, and video was taken that captured the assault.

Laura walked towards the motel lobby, and defendant followed her. Casandra called 911 after Laura reached the lobby and could be heard screaming. Los Angeles Police Department Officer Adrian Garcilazo responded to the call. After police

3

observed the surveillance video, they detained and questioned defendant. Defendant told Officer Garcilazo his girlfriend's name was "Clair." Defendant said that he had just come outside to walk with his baby (who defendant had with him in a stroller) and did not know what was going on. Officer Garcilazo asked defendant for the telephone number of the child's mother because he planned to arrest defendant and needed someone to take custody of the child. After defendant provided the requested number, the officer called and advised the woman who answered that she needed to come and pick up the child.

Laura arrived soon thereafter to take custody of the child. Officer Garcilazo observed that Laura had red marks on both sides of her neck; photographs of those injuries were presented to the jury. The officer opined that the neck injuries were consistent with someone either being strangled or grabbed by the throat. Laura initially identified herself to police as "Clair," and told officers that she had punched defendant to protect herself. Laura thereafter did not cooperate with the investigation.

## C. Defendant's Pre-trial Phone Calls with Laura, and Her Trial Testimony

In an information filed August 20, 2021, defendant was charged with inflicting injury on a cohabitant, girlfriend, or child's parent (§ 273.5, subd. (a); count 1) and violating a domestic violence court order with a prior conviction for violating a protective order (§ 166, subd. (c)(4); count 2). As to both counts, defendant was alleged to have suffered a prior conviction qualifying as a strike within the meaning of section 667, subdivisions (b) through (j) and section 1170.12.

Before trial, defendant called Laura from jail; the phone calls were played for the jury. In the first call, defendant told

4

Laura the encounter at the motel "wasn't that serious," and suggested the case would be dropped if "the victim" did not go to court. He told Laura he was thinking of killing himself and that he could not stay in prison.

In the next call, defendant told Laura it would not matter whether she came to court, because authorities had video of the incident. Laura said that she hoped the video did not work and would say that she hit him. Defendant said he understood the video showed him choking Laura, slapping her, and punching her. Laura responded, "You didn't even punch me." Defendant then equivocated on whether the case might be dropped if Laura did not come to court. During this phone call, defendant reiterated that being locked up made him want to kill himself and also made various comments to Laura about their child, including that he missed their child, that he was missing seeing their child grow older, that he wanted to hold their child, and that their child was his whole world.

In the final call, defendant said he hoped the witness (Casandra) would not come to court. Defendant repeatedly asked Laura to talk with Casandra and convince Casandra to not come to court. He mentioned their child, how he loved the child, and how he might lose the child because Laura "wasn't listen[ing] to me." Near the end of the call, Laura commented that her throat was hurting, and defendant responded by encouraging her to think about how he felt being in jail. Defendant also told Laura that, during the incident, he was trying to grab her and look at her.

Laura testified at trial that defendant never harmed her. With regard to the January 2020 incident, Laura claimed not to remember what happened, and denied that defendant ever

grabbed her by the face. With regard to the July 2021 incident, Laura claimed she started the physical altercation by launching herself at defendant, pushing him, and taking a swing at him. Laura said she tried to run away, but defendant caught up to her. He yelled at her to go back upstairs. She tried to keep him away from her. At one point she testified that defendant did not grab or slam her, but instead held her back and pushed her so she would go back upstairs. At another point, she testified she did not remember him touching her in the courtyard. Laura said the same pattern occurred in the lobby; Laura swung at defendant, and he tried to calm her down.

When shown the surveillance video of her and defendant, she admitted that defendant did in fact touch her in the courtyard. Laura claimed the video portrayed her being held by defendant and told to go upstairs, not slammed against the wall.[3]

Laura testified she provided officers with a fake name because she did not want to get in trouble. She testified she told officers that defendant acted in self-defense, that she could not remember what happened, and that she was so mad that she blacked out. Laura explained that she was uncooperative with law enforcement because she did not want to incriminate herself.

## D.    Trial and Sentencing

After jury trial, defendant was found guilty on both counts. The jury also found true the allegation that the violation of the domestic violence protective order involved violence or a credible threat of violence. The court thereafter found that defendant

---

[3] Having ourselves reviewed the surveillance video admitted into evidence, this is not a credible description of what the video shows.

suffered a prior strike (§§ 667, subds. (b)-(j), 1170.12) and that he had violated probation on two outstanding cases.

The court sentenced defendant to four years on count 1, doubled due to the prior strike to eight years. The court imposed a concurrent term of two years on count 2, found defendant in violation of his probation in case No. TA151278, and ordered the sentence imposed for the probation violation to run concurrently to the sentence imposed on the current convictions. The court also found defendant in violation of probation in a third matter (case No. SA101531) and sentenced him to a consecutive one-year term in that matter, for an aggregate sentence of nine years. The court granted defendant 157 days of custody credits and imposed various fines and fees.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant does not challenge his conviction on count 2 (violating a prior restraining order), or any aspect of either probation revocation. He argues we should reverse his conviction on count 1 for inflicting corporal injury because the prosecutor committed two acts of prejudicial misconduct during closing argument—the first involving a mention of an unrelated case involving domestic violence committed by another defendant against another victim, and the second involving a discussion regarding strangulation.

These remarks occurred during the closing argument; defendant makes no claims of misconduct concerning the prosecutor's rebuttal argument. While defendant claims these remarks comprised the "greater portion" of the prosecutor's "theme" during closing, the record belies that claim. They constitute a small portion of a closing argument that spans 23

7

pages of transcript (the rebuttal takes up an additional 13 pages), and were made while arguing two discrete points among many made during the closing argument.  We set forth and address the challenged remarks below, after first addressing the law applicable to defendant's claims.

## A.    Legal Background and Standard of Review

"A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state."  (*People v. Hill* (1998) 17 Cal.4th 800, 820.)  "The standards governing review of [prosecutorial] misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 91 L.Ed.2d 144]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 . . . .)  'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 . . . .)  'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' (*Ibid*.)  When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]"  (*People v. Friend* (2009) 47 Cal.4th 1, 29.)  To

8

establish a claim of misconduct, "bad faith on the prosecutor's part is not required. ([*People v.*] *Hill*[, *supra*], at pp. 822-823.) '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

## B. The Prosecutor's Comments About Unrelated Domestic Violence Matters

### 1. *The Comments at Issue*

During his closing argument, the prosecutor characterized the trial as, in part, "[a]n intervention . . . in someone's life to help change behaviors and outcomes" and remarked that domestic violence cases can be more difficult for juries than for example a robbery matter because jurors are asked "to intervene into someone's personal life." The prosecutor noted that most domestic violence goes unreported, and even when it is reported most cases are dismissed because the perpetrator apologizes and emotionally manipulates the victim, and many prosecutors "are too lazy or too incompetent to try these cases when the victim is not cooperating." Defense counsel lodged no objection to any of these comments.

The prosecutor then stated victims or other individuals typically only cooperate when the perpetrator is the victim's ex-partner, or the assault "goes too far" like a shooting or stabbing. After the comment about victims cooperating against ex-partners, defense counsel said simply "Objection" without stating any grounds, and the court responded "This is argument. I will permit it."

9

The prosecutor then explained that he called Laura to testify so jurors would have all the evidence.  He argued Laura's testimony misrepresented what occurred, and the video and phone calls showed that defendant was controlling Laura through physical means and emotional manipulation.  That emotional manipulation included remarks about their child, including defendant's statements about missing the child while in jail captured on the recorded phone calls.  The prosecutor argued defendant's emotional manipulation involving the parties' child was one of the primary motivators for Laura testifying as she did.

The prosecutor then mentioned a prior unrelated domestic violence case he had handled involving a defendant with the last name Marquez who tortured his victim with hot metal objects, and how despite that abuse the victim was uncooperative because she and Marquez had a child in common.  The prosecutor noted the victim later divorced Marquez and got sole custody of their child, but at the time of his criminal trial "she stood by that man" despite him burning her arms.  The prosecutor ended this anecdote by noting it illustrated "the strength of emotional manipulation when you're dealing with children" before moving on to discuss other examples of emotional manipulation in the recorded phone calls and other facts in this case the prosecutor argued established guilt.  The Marquez matter was not further referenced during closing argument.

Defense counsel did not object to this anecdote at the time it was made.  After the prosecutor's closing argument concluded, and before the defense closing argument began, defense counsel objected at sidebar to the reference to the Marquez matter as "prosecutor misconduct" and asked for a mistrial.  The court denied the motion, remarking "I think the prosecutor made it

10

very clear that he was distinguishing that case from anything that happened in this case and that his point was not to inflame the jury, but to draw attention to the point he was making." The prosecutor explained that he referenced the Marquez case to explain the incentives Laura had to support her abuser, and indicated the court could issue a limiting instruction to make sure the jury did not consider the reference for any improper purpose but that the prosecutor was "not even sure [such an instruction was] necessary." After the mistrial request was denied, defense counsel did not ask for an admonition or limiting instruction.[4]

2. *The Alleged Comments Were Neither Error nor Prejudicial*

Defendant argues the Marquez anecdote was prejudicial error because it was based upon facts outside the record and improperly urged the jury to base its verdict on an emotional subjective response rather than the evidence. As no objection was made at trial to the other remarks about domestic violence statistics and prosecutions, defendant does not assert those remarks are grounds for reversal; he nevertheless claims they must be considered because they provide context for the Marquez anecdote.

---

[4] After conviction, defendant filed a motion for a new trial that, among other things, again argued the comments about the Marquez case were misconduct. The trial court rejected this argument, finding that "[t]he prosecution's reference to the case involving the woman who was tortured was simply an effort to show the extreme lengths that recanting victims will go to try and aid the perpetrator of violence" and were not an effort to appeal to the passions of the jury.

11

As noted above, "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) There is an exception to this rule, however, when the objection or the request for an admonition would have been futile. (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

The anecdote at issue was told about one quarter of the way through the prosecutor's closing; no objection was made until after the closing concluded. Defendant implicitly concedes that the objection was not timely made, arguing instead an earlier objection would have been futile because the court overruled the objection when it was eventually made after the closing concluded. We agree under the circumstances here that an earlier objection, if made, would have been overruled on the merits and therefore futile; nothing in the court's ruling when the objection was finally made suggests the court would have ruled differently if the objection was made earlier.

Similarly, we do not find forfeiture because defense counsel failed to request an admonition. The court's statement in response to the prosecutor's suggestion regarding the potential for an admonition was not to indicate openness to that idea, but instead to state that counsel had made their records, and any issue with the Marquez anecdote would be addressed by the Court of Appeal if defendant was convicted. This sequence of events and resulting ruling did not provide a realistic opportunity for defense counsel to request an admonition. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 820-821 [absence of a request for a curative admonition does not forfeit the issue for appeal if the

12

court overrules an objection to alleged prosecutorial misconduct such that defense counsel has no opportunity to make such a request].)

Defendant asserts a prosecutor's closing argument must be restricted to commenting on the evidence before it. It is true that a prosecutor commits misconduct by basing an argument on case specific facts not in evidence. That can include, for example, explicitly referencing case specific facts not admitted into evidence (*People v. Ledesma* (1987) 43 Cal.3d 171, 238 [misconduct for prosecutor to refer in argument to victim's extrajudicial identification of defendant]) or suggesting " ' " 'that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' " ' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.)

In referencing the Marquez matter, the prosecutor did not attempt to put case specific facts before the jury that were not admitted into evidence. Instead, the prosecutor told a brief anecdote about an unrelated matter not involving defendant to illustrate an argument the prosecutor was making about the specific facts of this case—namely the evidence of defendant's emotional manipulation of Laura and how that emotional manipulation helped explain why she testified as she did.

That being said, we need not decide if the comments about the Marquez matter strayed beyond the allowable bounds of argument because even if they did the error was harmless. With reference to the federal constitutional standard, the remarks at issue were brief, and did not infect the trial with such unfairness that defendant was denied due process. (*People v. Cash*, *supra*, 28 Cal.4th at p. 733.) Instead, the closing argument focused on the evidence admitted during the trial and why that evidence

pointed to guilt. Nor, applying the state law standard, is it reasonably possible the jury would have reached a result more favorable to the defendant had the prosecutor not mentioned the Marquez anecdote. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 319.) The jury was instructed that in weighing guilt they were to consider only what was received into evidence during the trial, and that nothing the attorneys said was evidence including remarks in closing argument. We agree with the trial court that "the prosecutor made it very clear that he was distinguishing [the Marquez] case from anything that happened in this case and that his point was not to inflame the jury, but to draw attention to the point that he was making." The prosecutor's closing argument did not dwell on this anecdote but focused on the facts before the jury, and the evidence of guilt—including videotape of the physical altercation, recorded phone calls between defendant and Laura, eyewitness testimony from a disinterested third party, photographs of Laura's injuries, and testimony from Laura that lacked any credibility—was overwhelming.

## C.   The Prosecutor's Comments About Strangulation

### 1.   *The Comments at Issue*

When discussing the elements necessary for the jury to convict on count 1, the prosecutor noted the People had to prove that the injury inflicted by defendant on Laura resulted in a traumatic condition. In particular, as relevant here, the jury was instructed that a traumatic condition means a condition of the body including but not limited to injury resulting from strangulation or suffocation caused by physical force. The jury was further instructed that strangulation and suffocation include

14

impeding the normal breathing or circulation of the blood of a person by applying pressure on the throat or neck.

The prosecutor gave examples of the type of injuries that would qualify as a traumatic condition (such as hitting, pushing, and choking Laura), and said this case included an injury because of strangulation or suffocation.  The prosecutor then argued as follows:  "Why is strangulation important?  It's literally the most sensitive, most potentially deadly thing you do is choke someone or strangle them.  This part of your body is incredibly vulnerable."  The defense objected that the argument was not based on facts in evidence; the court overruled the objection.  Without further objection, the prosecutor then noted the neck connects the brain to the heart and the lungs, and that strangling impedes airflow to the lungs and as well as blood flow to the brain.  The prosecutor remarked that "you can go awhile without dying without air," but that blood flow to the brain was important and "[t]he last thing you want to do is impede blood flow going to someone's brain."  The prosecutor ended this portion of his remarks by saying "So when you strangle or suffocate someone, impeding the normal breathing or blood of the person by applying pressure to the throat, that can potentially be a sufficient traumatic injury."[5]

---

[5] Defendant's post-conviction new trial motion also argued that the prosecutor's comments concerning strangulation were misconduct and not within common knowledge.  The trial court rejected this claim, finding that the effects of strangulation as argued in the People's closing argument were commonly known by laypeople.

2.    *The Statements About Strangulation Were Not Misconduct*

Defendant argues these remarks were improper because they are matters outside of jurors' common knowledge and not based on evidence in the record.

When the prosecutor began to discuss strangulation, defense counsel initially objected but did not seek a curative admonition.  Unlike the Marquez anecdote, nothing in the record suggests that requesting an admonition (for example, a limiting instruction on how jurors should consider these statements) would have been futile.  By failing to request an admonition, defendant has failed to preserve this issue for appeal.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1205.)

Even if this claim had been preserved, we perceive no error.  Counsel (including prosecutors) have wide latitude during argument, which "includes stating matters not in evidence, but which are common knowledge."  (*People v. Dickey* (2005) 35 Cal.4th 884, 915.)  The average juror knows the neck's location on the body, and its importance to breathing and oxygen reaching the brain.  The average juror also knows that choking a person impedes air reaching the lungs and blood reaching the brain, and that restricting air and blood flow poses a risk of injury.  (See, e.g., *People v. Sanders* (1969) 268 Cal.App.2d 802, 805, fn. 1 [common knowledge "that any stoppage of the flow of blood to the head until one becomes unconscious is attended by serious danger"].)  That is essentially all the prosecutor said.  Because these comments were within the common knowledge of the average juror, the prosecutor did not err by including them in his closing argument.

16

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.